661 So.2d 1109 (1993)
Lucathryn WILSON a/k/a Lucatheryn Wilson a/k/a Lucatherine Wilson
v.
STATE of Mississippi.
No. 91-KA-0294.
Supreme Court of Mississippi.
October 28, 1993.
Opinion Granting Rehearing September 28, 1995.
Dissenting Opinion Grant of Rehearing September 28, 1995.
*1110 David G. Hill, Hill White & Minyard, Oxford, for appellant.
Michael C. Moore, Atty. Gen., Ellen Y. Dale, Sp. Ass't. Atty. Gen., Jackson, for appellee.
Before HAWKINS, C.J., and JAMES L. ROBERTS, Jr. and SMITH, JJ.
En Banc.
Dissenting Opinion by Justice Smith on Grant of Rehearing September 28, 1995.

ON PETITION FOR REHEARING

[Filed Sept. 28, 1995]
Hawkins, Chief Justice, for the Court:
This case is before the Court on petition for rehearing after being previously affirmed by per curiam decision. We now reverse and remand.
The Petition for Rehearing in this case is granted with the following opinions of this Court.
Lucathryn Wilson has appealed her conviction in the circuit court of Marshall County of the sale of cocaine. Because of the erroneous cross-examination of Wilson in a weak case factually, we reverse and remand.

FACTS
There are three individuals involved in this case: Donna Conner, an investigator in the Mississippi Bureau of Narcotics (MBN), Esau Shaw, a confidential informant, and Lucathryn Wilson, the defendant.
Agent Conner, who worked out of the Oxford office, was asked by her sergeant, Eddie McCullough of the MBN, who worked out the Tupelo office, to assist him in an investigation in Holly Springs and Marshall County.
She went to Holly Springs on February 25, 1987, and met with McCullough, another MBN officer and Shaw. After Shaw was searched, he got into Conner's car, an official state vehicle, and the two went to a building on Memphis Street (also Old Highway 78), which housed a district office of MBN and also "Moffitt's Hair Care Center." Conner parked in the parking lot. It was between 6:30-6:35 p.m.
Conner saw Shaw go into the beauty parlor and return with a black female who Shaw identified as Lucatheryn Wilson. (Whether it was then or later that Shaw told Conner it was Wilson is not made clear in the record.) According to Conner the car light in her car was on. The woman entered on the passenger side of the car and got onto the back seat. Shaw got into the front seat, passenger side. In a transaction lasting not more than two minutes, Shaw purchased a white packet of cocaine from the woman, and Conner paid her $100. A recording was made of the purchase, but somehow Conner lost it at a later date after the defense made a motion to hear it.
Before that evening Conner had never seen the woman from whom they made the purchase.
No arrest was made then or subsequently by the MBN. Instead, the MBN presented the matter to the Marshall County grand jury 20 months later, and on October 14, 1988, Wilson was indicted for the felonious sale of cocaine, a controlled substance, under Miss. Code Ann. § 41-29-115(A)(a)(4) (1972) and for violation of Miss. Code Ann. § 41-29-139(a)(1) (1972). Conner did not see Wilson in the interim. On cross-examination Conner testified she did not see Wilson from February 25, 1987, until 18 months later when she was indicted in October 1988. R.II, 119. On redirect examination during trial, she testified she had seen Wilson "a couple of times from then until now at different times." R.II, 134.
From this record Conner's identification of Wilson at trial was based solely upon the sale which occurred February 25, 1987. She had not seen the seller of the packet of cocaine before that evening, and not again until indictment.
Shaw's confused testimony at trial was of no benefit to the State.
The case went to trial November 8, 1990. Wilson testified in her own behalf, vigorously denying any sale of cocaine. On cross-examination Wilson was first asked if she participated in the drug transaction of February 25, 1987, which she denied. She was then asked if she had any knowledge of it, which she *1111 again denied. She was then asked if she knew Esau Shaw, and she replied that she did, and had known him a long time. Had she had any dealings with him? She had not.
Further on cross-examination she denied knowing what cocaine looked like. Upon further questioning she testified the first time she ever saw Conner was at a hearing after she had been arrested following her indictment. R.II, 174. The following testimony was then elicited on cross-examination:
Q. And I guess you're going to tell us you don't even know anybody that fools with cocaine?
A. Say what now.
Q. I guess you're going to tell us you don't know anybody that fools with drugs?
A. I don't fool with anybody that fools with drugs. I hear of people fooling with drugs but I don't fool with anybody that fools with drugs.
Q. Well, do you know Percy Eckells?
A. I sure do.
Objection was made, the jury retired and a motion was made for a mistrial, because Eckells was under indictment for a drug offense. The State argued it was being offered for impeachment purposes, and the court overruled the objection. The jury returned and the cross-examination continued.
Q. My last question was do you know Percy Eckells?
A. Yes.
Q. Do you know that he's charged with some type of drug offense?
A. Yes.
Another objection, again overruled.
Q. And is it your opinion  how do you know Percy Eckells?
A. Well, he's my boyfriend.
Q. And you've known him for a long while, several years?
A. About four or five years.
Q. And are you saying that the charges against you are just crumped [sic] up  made up  a lie?
A. Yes. It's a lie.
Q. And then you're also saying, I presume, that the charges against him were made up?
A. Yes.
With this the State concluded its cross-examination and both sides rested. No proof was offered as to Eckells.
Before this transaction Wilson had never been charged with any drug offense.

LAW
While factually weak, the State did make a jury issue on whether or not the woman who sold the packet to Conner was Wilson.
The cross-examination of Wilson above-quoted was inflammatory and prejudicial. She was charged with the sale of cocaine. She had pleaded not guilty and just testified, denying any sale to Shaw or Conner. None of her testimony on direct examination opened the door to a line of inquiry by the prosecution, asking her to deny she even knew anybody who fooled with drugs. This was compounded by asking her if she knew Percy Eckells, followed by the prosecution informing the jury that Eckells was charged with a drug offense. It was compounded even further by making her admit or deny the charges against Eckells. Wilson's acquaintance with Eckells was totally irrelevant to the indictment against her.
"Relevant evidence" is defined by Rule 401 of the Mississippi Rules of Evidence as evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." M.R.E. 401. Furthermore, Rule 402 states that "evidence which is not relevant is not admissible." M.R.E. 402. Clearly, the fact that the defendant's boyfriend had been charged with a drug offense had absolutely no "tendency to make the existence of any fact that is of consequence to the determination of the action" more or less probable. Rule 402 commands that this evidence be therefore excluded. It is also well established that "guilt by association is neither a recognized nor tolerable concept in our criminal law." Davis v. *1112 State, 586 So.2d 817, 821 (Miss. 1991). Any attempt by the prosecutor to use the relationship between Wilson and her boyfriend to infer her guilt was improper and should not have been allowed.
In addition, any attempt to characterize this evidence as "impeachment" evidence must also fail. According to Rule 608(a):
the credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness, and (2) evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise.
As the existence of the relationship between Wilson and her boyfriend is neither opinion nor reputation evidence, it is not admissible under Rule 608(a).
Furthermore, 608(b) states in part:
Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning his character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.
According to the recent case of Brent v. State, 632 So.2d 936 (Miss. 1994), under Rule 608(b) "the proffered conduct must be such as to reflect upon the witness's character for truthfulness. If the past conduct did not involve lying, deceit, or dishonesty in some manner, it cannot be inquired into on cross-examination." Id. at 944. Furthermore, "the trial court has no discretionary authority to permit inquiry by cross-examination into conduct not involving truthfulness." Id. In the case at bar, the defendant's conduct of having a relationship with a man who was charged with a drug offense did not involve lying, deceit, or dishonesty and had absolutely no probative value whatsoever in regard to her character for truthfulness or untruthfulness. Under Rule 608(b), as clarified by Brent, the introduction of such evidence is not permitted.
Finally, once the State raised the issue, they had a duty to offer proof which would back their claim. "When the State or any party states or suggests the existence of certain damaging facts and offers no proof whatever to substantiate the allegations, a golden opportunity is afforded the opposing counsel in closing argument to appeal to the Ninth Commandment. `Thou shall not bear false witness... .' Exodus 20:16" Hosford v. State, 525 So.2d 789 (Miss. 1988). For the State to so accuse the defendant and then let suspicion fester in the minds of the jury is impermissible. Unsubstantiated innuendo such as that which was raised here should never be allowed.
Wilson's "Motion for Stay of Mandate Pending Consideration of Petition for Rehearing" is granted.
REVERSED AND REMANDED.
DAN M. LEE, P.J., and SULLIVAN, BANKS and McRAE, JJ., concur.
SMITH, J., dissents with separate written opinion joined by PRATHER, P.J., and PITTMAN and JAMES L. ROBERTS, Jr., JJ.

DISSENTING OPINION ON PETITION FOR REHEARING
SMITH, Justice, dissenting:
On Petition For Rehearing, Lucathryn Wilson alleges this Court has overlooked or misapprehended specific points of law or fact; however, Wilson is simply rehashing previously argued facts and law which this Court considered in depth on direct appeal.
The majority, misconstruing some facts and totally ignoring others in this record, claims that "factually this case is both troubling and weak, and when combined with an erroneous cross-examination of Wilson," a reverse and remand of Wilson's conviction is *1113 required. I strongly disagree and must dissent.
Let us first examine the record to test the validity of the majority's claim that this case is weak factually. On February 25, 1987, Esau Shaw, a confidential informant, notified the Mississippi Bureau of Narcotics (MBN), Agent Donna Conner, that Wilson had indicated to Shaw that she would sell him cocaine. Shaw was a drug dealer and under indictment at the time of Wilson's trial. Prior to the drug buy from Wilson, Shaw was searched and had no cash or cocaine on his person. Agent Conner wore a recording device in order to have additional proof of this cocaine transaction with Wilson. Unfortunately the tape was of poor quality. Two other MBN agents, Sgt. Eddie McCullough and Nat Baker, conducted surveillance of the cocaine transaction with Wilson. Wilson, while seated in Conner's vehicle, delivered cocaine to Shaw and Conner handed Wilson $100.00 in official state funds as payment for the cocaine. Wilson had set the price for the cocaine.
Immediately after the drug deal, Conner, Shaw, McCullough and Baker conducted a post-buy meeting. A search of Shaw revealed the substance which was later determined to be cocaine, by J.C. Smiley, Sr. of the Mississippi Crime Lab.
The majority is concerned with what it claims as "poor identification" of Wilson. This statement is absurd. At trial both Conner and Shaw positively identified Wilson as the individual in the vehicle who sold them the cocaine. Wilson even admitted during her testimony at trial that she had known Shaw, "Well, really a long time." The identity of Wilson was clearly and sufficiently established. The only evidence to the contrary was from Wilson, who simply told the jury that she was not the person who sold the cocaine on that date. Although several years had elapsed since the incident, when asked by her counsel where she was on this occasion, Wilson without hesitation, immediately responded that she was probably at home with her children. The jury was not persuaded.
It is clear that the jury's verdict finding Wilson guilty of sale of cocaine was not against the overwhelming weight of the evidence. This was not a weak case factually as the majority alleges. Is the majority now requiring a second purchase of drugs to insure the identity of the seller in order for the majority to affirm the conviction of a drug dealer? The majority's footnote 1 appears to require just such a procedure. (Majority at ____.) The evidence presented at trial more than sufficiently supported the verdict of the jury. It is the function of the jury to weigh the evidence and to determine the credibility of the witnesses.
Factual disputes are properly resolved by the jury. Benson v. State, 551 So.2d 188, 193 (Miss. 1989); Dixon v. State, 519 So.2d 1226, 1228 (Miss. 1988). This is a classic case of disputed factual testimony between prosecution witnesses and the defendant, which the jury resolved in favor of the State. Temple v. State, 498 So.2d 379, 382 (Miss. 1986). This is true in spite of the majority's contention that, "Shaw's confused testimony at trial was of no benefit to the State." The jury heard and observed Shaw and his history of drugs as well as Wilson and her involvement with drugs. The jury believed Shaw.
The only so-called confusion occurred when defense counsel, in cross-examination of Shaw, attempted to impeach his trial testimony by comparing his preliminary hearing testimony wherein Wilson's case at bar was discussed along with two other drug buys involving Wilson's boyfriend, Percy Echols (Eckells). Shaw and Agent Conner had been involved in all three cases, which occurred in close time proximity to each other. Wilson's counsel, in cross-examination of Shaw, was jumping back and forth between these various drug buys mixing the dates up and comparing Shaw's preliminary hearing testimony with his trial testimony. However, Shaw told the jury that he had reviewed his written statement that he gave the MBN and "got my dates together." There was no confusion except in the mind of defense counsel. Although the State's confidential informant was an indicted drug dealer, Shaw's believability and credibility was for the jury to resolve rather than the majority of this Court and the jury apparently believed Shaw *1114 rather than Wilson. Once again, the record fails to support the majority's claims.
This entire episode, which was the subject of an issue raised by Wilson, but not addressed by the majority, was risky for the defense counsel and almost caused a mistrial. It was obvious to the trial judge, apparently to the majority of this Court, and certainly to this dissenter, that defense counsel opened the door to this potential quagmire and must be accountable for such action.
Likewise, considering motions for a directed verdict, a peremptory instruction, or for a judgment of acquittal notwithstanding the guilty verdict, all test the legal sufficiency of the evidence. This Court's standard of review is more than familiar:
Where a defendant has moved for J.N.O.V., the trial court must consider all of the evidence  not just the evidence which supports the State's case  in the light most favorable to the State. The evidence which is consistent with the verdict must be accepted as true. The State must also be given the benefit of all favorable inferences that may reasonably be drawn from the evidence. If the facts and inferences so considered point in favor of the defendant with sufficient force that reasonable men could not have found beyond a reasonable doubt that the defendant was guilty, granting the motion is required. On the other hand, if there is substantial evidence opposed to the motion, that is, evidence of such quality and weight that, having in mind the beyond-a-reasonable-doubt burden of proof standard, reasonable fair-minded jurors in the exercise of impartial judgment might reach different conclusions, the motion should be denied and the jury's verdict allowed to stand.
Fleming v. State, 604 So.2d 280, 287 (Miss. 1992) (quoting Lee v. State, 469 So.2d 1225, 1229-30 (Miss. 1985)) (citations omitted). See also Cook v. State, 467 So.2d 203, 208 (Miss. 1985).
The majority claims this case is troubling because there was an eighteen (18) to twenty (20) month delay in presenting this case to the grand jury after making an arrest. The majority's concern is misplaced. Welcome to the 1990's. Today we live in an entirely different and dangerous world where drugs can be found on practically every street corner in every small town in America including Holly Springs, Mississippi. This drug-infested world in which drug agents like Donna Conner are required to conduct undercover operations, of necessity requires time, skill, patience, careful planning and surveillance. These are all essential factors which help insure the safety and lives of the confidential informant, the undercover agent and the other necessary surveillance agents involved in the undercover operation.
Delays in time are essential to allow a confidential source and undercover agent to track down all known sources of illegal drugs within the community where they are operating prior to making arrests. Then it becomes essential to make all arrests at once to insure the success of the operation and to protect the CI and agents. There is no merit to the majority's "troubling delay" concerns. More importantly, Wilson never complained or raised this issue.
Next, the majority is troubled by the loss of the recording which the majority claims "would probably have helped identify the seller as being Wilson, or someone else." The majority alleges that because of numerous investigations conducted in the area by MBN Agent Conner during this time period and because of poor identification testimony, that Conner should have made more than the single purchase of cocaine. Why? What more is required other than the positive identification of Wilson by Shaw and Conner? The tape recording of the drug deal would have helped give stronger support to the State's already strong case had the tape not been lost, but only if it was of good quality. Agent Conner testified that it was not of good quality and its usefulness in court was doubtful.
There is no mystery about the lost tape recording. The record clearly reveals what occurred, but the majority neglects to mention that part of the record. The majority opinion also totally ignores that the record reveals Wilson and her first attorney, James Bonner, listened to the tape. Wilson's trial *1115 counsel, public defender Clencie Cotton, testified at Wilson's sentencing hearing. On direct examination, in response to a question posed by David Hill, Wilson's appellate counsel, Cotton stated that Wilson had informed him (Cotton) that Bonner requested to hear the tape and that an official of MBN met them (Bonner and Wilson) and in their presence, they had listened to the tape. Hill, admits this in his brief at page four. Unquestionably, Wilson and her first attorney, Bonner, heard the tape. Whether notes were made, or whether the information on the tape was relayed to Cotton is not available in the record, and we cannot speculate beyond the record. That Cotton knew Bonner and Wilson had heard the tape is unrefuted. Why didn't Cotton ask either of them, about the significance or benefit, if any, of this tape recording of the drug transaction?
The majority's mystery of the disappearing tape is solved by Agent Conner's testimony. Conner stated that on several occasions after Cotton commenced representation of Wilson that the tape had been removed from MBN security and carried to the courthouse for various hearings including the preliminary hearing, but due to various circumstances, they had never gotten together to listen to the tape. The last time Conner went to retrieve the tape, it was apparently misplaced as she could not find it. It is thus undisputed that the MBN unintentionally misplaced the audio tape.
Regardless, this situation is of no great consequence and once again the record should dispel the majority's concern. Unquestionably, some of the responsibility regarding the failure to listen to the tape recording falls upon the defense. Yet, the significance of this entire dilemma is controlled by Washington v. State, 478 So.2d 1028 (Miss. 1985), wherein this Court in its most deliberate pronouncement on this subject stated:
It is a general rule that the intentional spoliation or destruction of evidence relevant to a case raises a presumption, or, more properly, an inference, that this evidence would have been unfavorable to the case of the spoliator. Such a presumption of inference arises, however, only where the spoliation or destruction was intentional and indicates fraud and a desire to suppress the truth, and it does not arise where the destruction was a matter of routine with no fraudulent intent.
Washington, 478 So.2d at 1032. Washington is in accordance with the watershed case of California v. Trombetta, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984). Trombetta held that the State's duty to preserve evidence is "limited to evidence that might be expected to play a significant role in the suspect's defense." Trombetta, 467 U.S. at 488, 104 S.Ct. at 2533. Had the tape been found, the record indicates that the tape was of poor quality and not suitable to be used as evidence.
All the cases cited by Wilson were decided before the decision in Arizona v. Youngblood, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), in which the Supreme Court made it clear that a defendant claiming a violation of due process caused by loss or destruction of evidence that might have been of value to the defendant's case has the burden of proving that the prosecution acted in bad faith. We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process. Youngblood, 488 U.S. at 58, 109 S.Ct. at 337.
The Court held in that case that at most the defendant had shown the police were negligent in failing to preserve evidence, which under the constitutional standard was not enough to show a violation. This Court applied Youngblood in Wilson v. State, 574 So.2d 1324, 1329 (Miss. 1991), citing the above quote. See also Holland v. State, 587 So.2d 848, 869 (Miss. 1991). Clearly, the most shown in the case sub judice was the possibility of mere negligence on the part of MBN agents, but never any bad faith.
Wilson was entitled to hear and in fact did hear the tape in question. That is not the issue presently considered. Wilson's second attorney, Cotton, did not hear the tape. We are confronted solely with the appropriate rule where the State has unintentionally lost an audiotape of a drug transaction making it impossible for the State to comply with defense *1116 counsel's request that the material be produced pursuant to discovery request. In such instances, prosecutorial bad faith is required for reversal. It does not arise where the destruction was a matter of routine use of evidence with no indication of fraudulent intent. Under the facts presented by this record, there was no evidence of intentional destruction of the tape. Agent Conner testified that she did not intentionally misplace the tape or conceal it, that to the best of her knowledge the established procedure for preserving the evidence had been followed. She further testified that after removing the tape several times from evidence security and carrying it to the courthouse for various hearings, it simply was not there the last time she looked for it. Once she ascertained that the tape was missing, she made a diligent search to find it without success. Wilson introduced no evidence to controvert Agent Conner's testimony. Also, Wilson cross-examined Conner on the issue of the lost tape, and covered the issue with the jury during closing argument. The trial judge had prohibited the State from mentioning the tape unless the subject was brought out by the defense.
The bottom line about the majority's "troubling points," which are (1) that this is a weak factual case, (2) poor identification of Wilson, (3) length of time from the incident to arrest, and (4) the lost tape, is that all of these issues were considered by the jury. The evidence was more than sufficient to support the jury's verdict. In Williams v. State, 463 So.2d 1064, 1068 (Miss. 1985), this Court stated:
Once the jury has returned a verdict of guilty in a criminal case, we are not at liberty to direct that the defendant be discharged short of a conclusion on our part that from the evidence, taken in the light most favorable to the verdict, no reasonable hypothetical juror could find beyond a reasonable doubt that the defendant was guilty.
Reasonable jurors in the case sub judice could and did believe the State's evidence over Wilson's and found her guilty of selling cocaine. We should not disturb the verdict of the jury.
The majority ultimately places great distance between these so-called "troubling concerns" and reversible error. The majority even admits a jury issue was made on the identification of Wilson. Yet, the opinion certainly implies wrongdoing by the State and hints at near errors through these combined events. However, the record simply does not support the majority in their unwarranted concerns.
Finally, in addressing the law, of all the majority's cited authority, none was furnished by Wilson. The majority focuses on Miss.R.Evid. 401, 402 and 608(a) and (b), none of which were cited by Wilson as authority. Also, the cases utilized by the majority as support were not cited by Wilson. The few cases cited by Wilson were not on point and thus were not applicable. Citing only inapplicable cases amounts to a failure to provide this Court with any authority at all. "This Court is under no obligation to consider this error without citation to authority." Brown v. State, 534 So.2d 1019, 1023 (Miss. 1988); See Clark v. State, 503 So.2d 277 (Miss. 1987); Kelly v. State, 463 So.2d 1070 (Miss. 1985); Redmond v. State, 457 So.2d 1344 (Miss. 1984). "An assignment lacking authority lacks persuasion on review." Brown, 534 So.2d at 1023; Smith v. State, 430 So.2d 406 (Miss. 1983). The majority has done for Wilson that which she did not do for herself. Accordingly, we should not even consider Wilson's argument on the issue of erroneous cross-examination.
During cross-examination of Shaw, Wilson's counsel almost caused a mistrial jumping back and forth between different drug cases involving both Shaw and Conner, but which did not involve Wilson. Then counsel asked Wilson on direct if she had any dealings with Shaw, to which she replied "no". Wilson told the jury she didn't even know what cocaine looked like. However, Wilson's counsel asked one question too many of her on direct examination. The general question was asked:
Q: Any dealings whatsoever involving drugs?
A: No sir.
The defense attorney opened the door and the district attorney stepped right in. Later *1117 on cross-examination, in response to a question by District Attorney Little, Wilson stated:
A: I don't deal cocaine and I don't be around it. .. . I don't fool with anybody that fool with drugs. I here (sic) of people fooling with drugs but I don't fool with anybody that fools with drugs.
Q: Well, do you know Percy Eckells?
A: I sure do. He's my boyfriend ... I've known him about four or five years.
Q: Do you know that he's charged with some type of drug offense?
A: Yes.
The State maintained that the questions were asked for impeachment only. Wilson's defense strategy was that she was not the person who sold the cocaine to Shaw and Conner. Wilson was simply attempting to convince the jury that not only did she not sell the drugs but that she didn't have anything to do with anyone who sold or used drugs. Wilson testified that she had "no dealings with Shaw, didn't even know what cocaine looked like, had no dealings whatsoever involving drugs, and would not even fool with anybody that did fool with drugs." Contrary to the majority's claims, it is clear that the State was simply attempting to impeach Wilson on her testimony as not being truthful with the jury. Wilson's truthfulness was clearly at issue and the testimony in question had probative value for impeachment purposes as it was so offered by the State. The majority has effectively allowed Wilson to succeed in her defense of not "not fooling with drugs or anyone that fools with drugs" in spite of the jury's insight into this entire scenario as revealed by their verdict. It is the majority that has been fooled. At the very least, this issue was harmless error, if error at all, in view of the substantial case against Wilson.
This Court should not disturb the verdict of the jury finding Wilson guilty of selling cocaine. Noteworthy is the fact that Wilson was sentenced to twelve years with six years suspended. She complains and raises the issue that Percy Echols plead guilty and received a suspended sentence, but again, and wisely I might add, the majority avoids writing on this meritless issue. Wilson's conviction and sentence should remain intact.
I respectfully dissent.
PRATHER, P.J., and PITTMAN and JAMES L. ROBERTS, Jr., JJ., join this opinion.