704 So.2d 452 (1997)
Rickey Lynn SNELSON
v.
STATE of Mississippi.
No. 93-DP-00023-SCT.
Supreme Court of Mississippi.
November 6, 1997.
James W. Craig, A. Randall Harris, Jackson, for Appellant.
Michael C. Moore, Atty. Gen., Jackson; Marvin L. White Jr., Asst. Atty. Gen., Jackson; Jeffrey A. Klingfuss, Sp. Asst. Atty. Gen., Jackson, for Appellee.
En Banc.
BANKS, Justice, for the Court:
¶ 1. Snelson was convicted of the capital murder of Stephen Goode, kidnaping and third degree arson. Because we find trial error of a magnitude that we cannot say that the determination of guilt and sentence were not affected, we are compelled to reverse and remand for a new trial. The court improperly allowed inflammatory and irrelevant evidence and beyond that there was an accumulation of error and near error which, when considered together, compel reversal.

*453 I.
¶ 2. During the January term of 1991, the grand jury for the Second District of Hinds County Circuit Court, indicted Charles Goode and Rickey Snelson on multiple counts. The counts were for murder, kidnaping, and arson. On February 4, 1992, pursuant to a motion by Snelson, the venue was changed to Hancock County. On February 18, 1992, a jury found Snelson guilty of capital murder, kidnaping, and arson. The jury sentenced Snelson to life imprisonment for the kidnaping and to death for capital murder. The court sentenced Snelson to three years for the arson conviction, to run consecutively with the other convictions. An execution date was set for April 13, 1992. The court entered an order staying execution pending this appeal.

II.
¶ 3. Charles Goode testified that on February 20, 1991, Rickey Lynn Snelson came to Charles' room at the Redwood Inn on Terry Road in Jackson, Mississippi. According to Charles, both of them were "broke" so they decided to break into Charles' uncle's house, because he knew his uncle had some guns. He and Snelson made arrangements to sell the guns to Johnny Edmondson. He stated that on the way out to his uncle's house, he and Snelson stopped and called his uncle to see if anyone was there. Charles let the phone ring twenty times and received no answer. Charles testified that Snelson said "if anybody's home or if anybody comes in, they'd have to be terminated." He stated that when they arrived at the uncle's house they drove by one time to make sure no cars were in the garage. There was a truck in the garage that they did not see when they drove by. Charles and Snelson parked their truck in the woods and walked to the house.
¶ 4. Charles testified that he opened the door and his cousin Stephen Goode was standing there with a rifle in his hand. Charles told Stephen that his truck had broken down and he needed to use the phone. He then pretended to call someone. Snelson asked Stephen for something to drink while Charles asked to use the restroom. Charles stated that when he returned from the restroom Snelson had the gun. Charles told Stephen to get down on the floor and Snelson punched Stephen in the mouth. Snelson got a cord and tied Stephen's feet and hands together and gagged him with a towel. Charles then went to Stephen's room and got two guns and some money. Snelson went to the master bedroom and came back with a gun and two bows. They also took a shotgun, a pistol, a ring, a walkman T.V., a radio, a pair of boots, a camcorder and a pocket watch.
¶ 5. Charles and Snelson got everything together and placed them in his uncle's pickup truck. They got Stephen up and put him in the truck. Charles stated that he was driving, Stephen was in the middle and Snelson was on the passenger side. They drove around looking for a place to kill Stephen. Charles testified that Snelson put a gun in Stephen's mouth and told him "he'd blow his fucking brains out." Charles stated that Snelson was poking Stephen with a knife and a syringe, to which Stephen replied: "don't torture me. If you're gonna kill me go ahead and kill me." He stated that they eventually went back to where he and Snelson had parked his truck and placed the stolen items in his truck.
¶ 6. Charles testified that Snelson got Stephen out of the truck and put him on his knees. Charles stated that he was on his way back to his truck to get some gas when he heard a shot. He stated that he got the gas, went back and saw his cousin lying in the mud and Snelson shot Stephen a second time. Charles then stated that Snelson set Charles' uncle's truck on fire. They then took the stolen items to Edmondson and sold them.
¶ 7. On February 21, 1991, both Charles Goode and Rickey Snelson were arrested. Both made statements confirming their involvement in the robbery and kidnaping. Both accused the other of being the killer in statements to the police. Charles Goode entered a plea agreement with the State. In return for Charles' testimony against Snelson, Charles would receive a life sentence without parole. On February 18, 1992, a jury found Snelson guilty of capital murder, *454 kidnaping, and arson. From this verdict, Snelson appeals.

III.
¶ 8. Snelson raises several issues. We will discuss only those which impact upon our decision to reverse and those which are likely to recur on a retrial of this matter.

a.
¶ 9. Snelson claims that irrelevant evidence of his participation in crimes other than the one here charged was admitted and as a consequence he was deprived of his right to a fair trial. We agree.

(1) Evidence of Drug Abuse
¶ 10. Snelson asserts that the trial court erred in allowing the prosecution to elicit from Goode claims that Snelson had purchased and smoked crack cocaine after the crime and that he had claimed that he had committed three or four other murders. During the trial, Goode testified that he paid five dollars for Snelson to take a cab from the Redwood Inn, where Goode and Snelson were staying, to the house of Timothy Myles, the individual who was supposed to sell a camcorder and some bows which Goode and Snelson had stolen. Goode was allowed to further testify that he had to pay for Snelson's cab because Snelson had spent his money on cocaine.
¶ 11. Before this testimony was allowed in the presence of the jury, the defense argued that evidence that Snelson had spent his money on cocaine was irrelevant and prejudicial. The state argued that this evidence was part of the res gestae and went to the mood of the defendant at the time. In overruling the defendant's objection, the court stated that "the court is ... not required to leave gaps in the ... testimony of the witnesses to require the jury to speculate as to what has occurred in the case... . I have to let the facts be presented as they exist and the court is not going to alter the course of the ... activities ... of the defendant or ... of this witness."
¶ 12. After the court made its ruling, the prosecutor asked Goode where he and Snelson went after selling the guns they had stolen. Goode testified that while traveling back to Jackson, they stopped at a truck stop because Snelson wanted to buy some cocaine. The prosecutor went on to ask the witness how Snelson ingested the cocaine. Goode explained that Snelson took a can, bent it in the middle, "poked a hole in it, put the rock on it, took his lighter and smoked it." Although this testimony would appear to be outside of the ruling of the trial court, the defendant failed to object to such inflammatory testimony, and is therefore procedurally barred from raising it as an assignment of error. See Foster v. State, 639 So.2d 1263, 1270 (Miss. 1994); Chase v. State, 645 So.2d 829, 844 (Miss. 1994); Cole v. State, 525 So.2d 365, 369 (Miss. 1987). Thus, the first issue is whether the trial court erred in allowing the witness to testify to Snelson's use of cocaine long after the crime had taken place.
¶ 13. Rule 401 of the Mississippi Rules of Evidence states:
"Relevant Evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.
Rule 402 states that "all relevant evidence is admissible." Thus, the question before this Court is whether evidence showing that Snelson bought and smoked cocaine with the proceeds of the stolen guns has a tendency to make any fact that was of consequence to the determination of whether Snelson killed Stephen Goode more or less probable than it would be without the introduction of such evidence.
¶ 14. In Wilson v. State, 661 So.2d 1109 (Miss. 1993), this Court held that evidence showing that the defendant's boyfriend had been charged with a drug offense had "absolutely no `tendency to make the existence of any fact that is of consequence to the determination of the action' [whether the defendant had sold cocaine to a government informant] more or less probable." Id. at 1111. The evidence was therefore held to be irrelevant and inadmissible under Rule 401.
¶ 15. In Collins v. State, 513 So.2d 877 (Miss. 1987), this Court held that the introduction of five pornographic magazines hidden *455 in a desk drawer inside of the defendant's shed, which were not used during the commission of a sexual battery, was improper. This Court stated that the magazines, other than the one which was shown to the victim and used during the commission of the crime, were "neither relevant to any issues in the case nor a part of the res gestae of the crime... . They were simply found in a desk drawer in a shed owned by the defendant." Id. at 879. The court held that there was "no evidence in the record linking the five additional magazines with the alleged sexual battery of Tammy T... . They were neither shown to Tammy T. nor viewed by Billy Wayne Collins during the commission of the crime." Id. at 879. Thus, they were irrelevant and inadmissible under Rule 401.
¶ 16. As we noted in Jenkins v. State, 507 So.2d 89 (Miss. 1987), whatever the concept of res gestae may have included in its historical use, it "most assuredly has never properly applied to wholly independent bad acts which are obviously unnecessary to the proof of the primary charge." Id. at 92-93 n. 2.
¶ 17. We hold that the evidence which showed that Snelson bought and used cocaine after he had sold the stolen guns did not have the tendency to make any fact that was of consequence to the determination of whether Snelson killed Stephen Goode more probable or less probable than it would without the introduction of such evidence. The fact that Snelson purchased and used cocaine with the proceeds of the stolen guns does not make it any more likely that he committed the murder of Stephen Goode. It is certainly separable from the main offense and cannot be made a part of whatever is referred to as the "res gestae" of the entire transaction. The evidence was clearly inflammatory and offered for the sole purpose of improperly influencing the jury.
¶ 18. Although the state argues that the evidence is admissible as proof of Snelson's motive under Rule 404(b), this Court warned in Mack v. State, 650 So.2d 1289 (Miss. 1994), that "prosecutors and trial courts alike should approach with caution any evidence of other crimes offered for the purpose of proving motive for a robbery. Robbery has its own motive  the attainment of something of value." Id. at 1313. In Mack, this Court acknowledged the danger of prejudice in presenting evidence to the jury that the defendant purchased crack cocaine after robbing and killing his victim. Id.
¶ 19. However, the court recognized that it was clear that Mack robbed Henry Fulton "because he needed money for cocaine." Id. Therefore, this Court stated that "because of the close connection of a specific monetary objective and because of the overwhelming evidence of guilt, we conclude that the error in admitting ... evidence [showing that the defendant purchased crack cocaine after robbing and killing Fulton], if any, is harmless beyond a reasonable doubt." Id.
¶ 20. Unlike Mack, there is no evidence showing that the primary objective of Snelson's actions was to obtain money to buy cocaine. Snelson's purchase of cocaine was a separate incident from the robbery and murder of Stephen Goode. The introduction of this evidence, therefore, constitutes reversible error.

(2) Evidence of Other Murders Previously Committed
¶ 21. The prosecutor also asked Goode if he had asked Snelson why he shot Stephen Goode. Charles Goode testified that while leaving the scene of the incident, he expressed to Snelson that he could not believe that Snelson had shot Stephen Goode. The prosecutor responded, saying "[a]ll right." Goode then testified that Snelson said: "[d]on't worry about it. That's my third or fourth." To this testimony, the defense objected and moved for a mistrial.
¶ 22. The defense stated that the statement made by Goode was a violation of the motion in limine and implied that the prosecution elicited the testimony from Goode. The court sustained the defendant's objection, and overruled the motion for a mistrial. The trial court further instructed the jury to disregard the statement, and continued with the prosecution's direct examination of Goode.
¶ 23. The appellant asserts that the prosecutor elicited this testimony and that the court's attempt to cure the prejudice resulting from this testimony was "too little too late." The state asserts that this portion of *456 Goode's testimony was unresponsive. While the State suggests that Goode's statement was "unresponsive," a review of Goode's prior statements leads ineluctably to the conclusion that the response was the only one which could have been anticipated for the question asked. After being arrested Goode gave a voluntary custodial statement, in which he explained the crime. At one point during his statement, Goode related that he asked Snelson why he committed the murder. The investigator taking the statement asked: "What did he say?" Goode stated that Snelson told him that Stephen Goode wasn't the "first one" that he had killed, and that Stephen was "his number four."
¶ 24. During the motion in limine, the defense requested that Snelson's alleged statement regarding his participation in other murders not be presented to the jury. The court ruled that it would make a ruling during the trial if such statement was offered and objected to. During the trial, after Goode described his version of events leading to the killing, the prosecutor asked the witness if he had said anything to Snelson as to why he shot Stephen Goode. Charles Goode informed the prosecutor that he expressed to Snelson that he could not believe that he had committed the crime. The prosecutor interjected, "[a]ll right" and Goode continued his testimony, informing the jury that Snelson told him that it was his "third or fourth" murder. There was an objection and it was sustained. However, the motion for mistrial was overruled.
¶ 25. Later, during a hearing in chambers, the court expressed its concern that the statement had been made in the presence of the jury. The court informed the defense that it would poll the jury at the defense's request to determine whether the jury could disregard such a statement. The defense, however, requested that the court not do so for fear that it would only bring more attention to the statement made by Goode. At the conclusion of the trial, the court instructed the jury that it was to "disregard all evidence which was excluded by the Court from consideration during the course of the trial." Therefore, the relevant inquiry is whether the jury can disregard the prejudicial statement.
¶ 26. This Court on numerous occasions has held that where the trial judge sustains an appellant's objection to the testimony of a witness and instructs the jury to disregard the same, prejudicial error does not result from that testimony. Shelby v. State, 402 So.2d 338, 340 (Miss. 1981) (citing Herron v. State, 287 So.2d 759 (Miss. 1974), cert. denied, 417 U.S. 972, 94 S.Ct. 3179, 41 L.Ed.2d 1144 (1974)); Wallace v. State, 466 So.2d 900, 906 (Miss. 1985); Mack, 650 So.2d at 1318. However, each case must stand on its own facts in determining whether particular error constitutes reversible error. Henderson v. State, 403 So.2d 139, 140 (Miss. 1981); Carleton v. State, 425 So.2d 1036, 1041 (Miss. 1983). A determination of whether such an error is incurable, resulting in a mistrial, rests within the sound discretion of the trial court. Logsdon v. State, 183 Miss. 168, 170, 183 So. 503, 503 (1938). This Court has held on various occasions that the trial court abused its discretion in not granting the defendant's request for a mistrial.
¶ 27. In Barlow v. State, 233 So.2d 829, 831 (Miss. 1970), this Court ruled that comments made by the district attorney during his cross-examination of the defendant, an elected Justice of the Peace being prosecuted for embezzlement, were prejudicial in nature to the extent that they constituted reversible error. The district attorney asked the following questions:
Q: So wouldn't you agree with me that a justice of the peace making that kind of money at the expense of the taxpayer ought to be honest?
... .
Q: You made enough money there that you could have been honest?
Id. This Court stated: "[t]hough both questions were objected to and the objections were sustained by the court as being improper, the effect nevertheless was to prejudice the jury and thus this is reversible error." Id.
¶ 28. In Henderson, Ricky Scott, a defense witness, was improperly asked on crossexamination by the district attorney whether he *457 had been indicted for burglary. Henderson, 403 So.2d at 140. The witness had previously answered, "No" on direct examination to the question by his attorney, "Have you ever been convicted of a felony?" Id. Also presented was the impropriety of the district attorney inquiring on cross-examination of the co-indictee, Michael Henderson, whether the jury had convicted him for the same offense of armed robbery on which the defendant was being tried. Id. Before an objection could be interposed, the witness answered, "Yea, because of you... ." Id. The trial court sustained the objection but overruled the motions for a mistrial, and instructed the jury to disregard the questions asked by the district attorney and the answers thereto. Id. This Court reversed the conviction, stating:
... when the improper conduct is compounded by the district attorney after having heard the court's admonishment to the jury on a prior occasion with reference to the same subject matter, the prejudicial effect on the jury is sometimes so great that we have no alternative but to reverse the conviction and sentence and remand the case for a new trial. In this case, the district attorney, after hearing the court's lengthy admonition to the jury to disregard his improper question with reference to Ricky Scott's indictment for the burglary of a dwelling, he thereafter, by a question, advised the jury that the appellant's co-indictee and twin brother, Michael Henderson, had been previously convicted for his participation in the same offense for which the defendant was on trial... .
Id. at 141.
¶ 29. In Williams v. State, 539 So.2d 1049 (Miss. 1989), the defendant was convicted under Miss. Code Ann. § 97-5-23 (1972) of gratification of lust. Dr. Donald Guild, a psychiatrist who had interviewed the child, testified for the defense as to, among other things, the child's propensity for truthfulness. Id. at 1050. During the cross-examination of Dr. Guild, the district attorney moved to introduce a video tape made of the child in the office of Dr. Brenda Chance, a social worker who had been counseling the child for several months prior to trial. Id. at 1051. The motion was overruled and the jury was instructed to disregard any references to the video tape. Id. Subsequently, on numerous occasions throughout the trial, the prosecutors moved for the introduction of the video tape. Id. Each motion was denied. Id. This Court stated that "... although the jury was instructed to disregard the remarks regarding the video tape at the first mention thereof, it cannot be said with confidence that the repeated subsequent references to the video tape did not influence the jury." Id. at 1052.
¶ 30. In the instant case, after hearing the court's instruction to the jury to disregard the statement made by Goode, the prosecutor refrained from making further references to the alleged confession by Snelson. Furthermore, at the conclusion of the trial, the court instructed the jury that it was to "disregard all evidence which was excluded by the Court from consideration during the course of the trial." However, it is this Court's view that the introduction of Snelson's alleged remarks to Goode after the commission of the crime had such a prejudicial effect that it cannot be concluded that such remarks did not influence the jury.
¶ 31. In Kearney v. State, 68 Miss. 233, 8 So. 292 (1890), the appellant was convicted of the murder of James Fossett and sentenced to capital punishment. During the trial, Dr. R.A. Quin was introduced as a witness by the defendant to prove, among other things, the character of the defendant for peace or violence. Id., 68 Miss. at 236, 8 So. at 293. On cross-examination by the district attorney, and over the objections of the defendant, the district attorney was permitted to ask the witness the following question: "Do you know whether or not he [the defendant] has ever killed a man before?" Id. Over objection the witness was permitted to answer: "I have heard that he had." Id.
¶ 32. In holding that the testimony should not have been admitted and reversing the trial court's decision, this Court stated:
[t]he manifest purpose of the testimony was to show either the motive of the accused in killing Fossett, or to attack his character for peace. In neither aspect should it have been admitted. The fact that the accused had on a previous occasion *458 killed a man, could not prove any of the circumstances under which, or the act by which Fossett was killed, nor throw any light upon the intent with which the accused killed him. The defendant was upon trial for a distinct offense, and that offense not of the character of those in which it is admissible to prove an unlawful purpose by showing guilt of the same character on another and independent occasion... . [I]t has never been held that the malice necessary to the crime of murder may be shown by evidence of the prior, independent and disconnected killing of another person.
Id., 68 Miss. at 237-38, 8 So. at 293.
¶ 33. In instances such as this we must apply the familiar maxim that one cannot "unbake an apple." It cannot be concluded that such testimony did not inflame or improperly influence the jury. The court erred in failing to declare a mistrial.

b.
¶ 34. Snelson also claims that he was deprived of a fair trial because of prosecutorial discovery violations. We find his claim well taken with respect to at least one such violation. That violation is an additional reason for reversal. Because we are reversing and remanding, these particular violations are not likely to recur. It follows that we need not engage in extensive discussion.
¶ 35. Snelson argues that the State violated the discovery requirements regarding: (1) a witness's testimony (2) bloodstain evidence, and (3) expert testimony. This Court has noted that "Rule 4.06 and the Box guidelines are designed to avoid `ambush' or unfair surprise to either party at trial." Robinson v. State, 662 So.2d 1100, 1103 (Miss. 1995); Holland v. State, 587 So.2d 848, 866-67 (Miss. 1991). In Duplantis v. State, 644 So.2d 1235 (Miss. 1994), this Court stated:

Box v. State, 437 So.2d 19 (Miss. 1983) (Robertson, J., specially concurring), first set forth the procedure trial courts should follow when confronted with a discovery violation. Miss.Unif.Crim.R.Cir.Ct.Prac. 4.06 now reflects the Box procedure. This procedure is equally applicable in capital cases.
When faced with previously undisclosed evidence to which the defendant has objected, the trial court should give the defendant a reasonable opportunity to familiarize himself with the evidence. If the defendant thereafter believes he may be prejudiced by admission of the evidence because of his lack of opportunity to prepare to meet it, he must request a continuance. Should the defendant fail to request a continuance, he has waived the issue. If he indeed requests a continuance, the State may opt to proceed without the undisclosed evidence, else the trial court must grant the continuance. Failure to follow the Box guidelines is prejudicial error, requiring reversal and remand.
Duplantis, 644 So.2d at 1249-50 (citations omitted). In a footnote to the above passage, the Court recognized that a motion for mistrial will suffice "as a request for a continuance." Id. (citing West v. State, 553 So.2d 8, 18 n. 6 (Miss. 1989)).
¶ 36. During opening arguments the prosecutor stated that:
[Y]ou'll hear from the testimony that this Defendant made the statement, "You know if anyone's there, they're going to have to be terminated."
The defense made an objection under Rule 4.06(i), arguing that the State never informed them of this alleged statement. The trial court granted the defense time to interview Goode, who was to testify that Snelson made this statement. The defense also moved for a mistrial, which is equivalent to a motion for a continuance for Box purposes. West, 553 So.2d at 18 n. 6. Snelson claimed that this was prejudicial because it goes to the issue of whether he intended lethal force to be used. The State informed the court that they had just learned of the statement the night before. The court allowed the statement to be used.
¶ 37. Snelson claims that this statement was an unfair surprise. Snelson cites McCaine v. State, 591 So.2d 833 (Miss. 1991), for the proposition that this was a critical discovery violation and that the time given to familiarize the defense to the statement was insufficient. In McCaine, this Court opined:

*459 The question presented here brings into direct conflict two important interests. First there is prosecution's interest in presenting to the jury all relevant, probative evidence. On the other hand, there is the accused's interest in knowing reasonably well in advance of trial what the prosecution will try to prove and how it will attempt to make its proof which, of course, includes the names of persons the state expects to call as witnesses. This state is committed to the proposition that these conflicting interests are best accommodated and that justice is more nearly achieved when, well in advance of trial, each side has reasonable access to the evidence of the other. See Rule 4.06 supra; Rules 26-37, Miss.R.Civ.P.
Id. at 836 (quoting Box, 437 So.2d at 21).
¶ 38. Snelson argues that this statement was prejudicial for two reasons. First, under Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), a non-killer defendant must intend that lethal force be used in order for a death sentence to be imposed against such a defendant. Snelson further claims that this is important because the jury did not find that he killed Stephen Goode. Second, this statement is direct evidence of the "avoiding arrest" aggravator that was submitted to the jury. Snelson points out that the jury did not find that Snelson was the killer. Snelson cites Box v. State, 437 So.2d 19 (Miss. 1983), where Justice Robertson stated:
[T]he general guidelines suggested above would realistically and effectively tell the state that its obligation to conform to discovery orders must be taken seriously. The state ought not be heard to say "we only discovered this evidence last night", or "the defendant should have known about this witness all along anyway" or, "this evidence is merely cumulative or corrobative", or the like.
Id. at 25 (Robertson, J., concurring) (footnote omitted). Snelson claims that his conviction should be reversed and a new trial granted because he did not have sufficient time to prepare due to this surprise. McCaine, 591 So.2d 833.
¶ 39. The State argues exactly as Justice Robertson suggests it shouldn't. What occurred here is that which this Court has stated Rule 4.06 is there to prevent. Robinson, 662 So.2d at 1103. Surely this statement was material, as it goes to intent to kill and to the purpose for the killing. Both of these are important in sentencing an individual to death. Surely the State realized that a statement of this kind was important enough to have been disclosed to the defense prior to its use in the State's opening statement to the jury. It was not until after the prosecutor mentioned it to the jury that Snelson was aware of the alleged statement. The court should have granted the mistrial. As Justice Prather remarked in McCaine, the "damage had been done" once the statement was made to the jury. McCaine, 591 So.2d at 836.

(3) Other Discovery Violations
¶ 40. There were other discovery violations which we do not discuss. Each was either harmless or not properly preserved under the Box guidelines. We trust that they shall not recur on remand. See Dennis v. State, 555 So.2d 679, 682 (Miss. 1990) (violation of Rule 4.06 is harmless "unless it shall appear from the whole record that such ... has resulted in a miscarriage of justice."); Duplantis, 644 So.2d at 1249 (should the defendant fail to request a continuance, he has waived the issue.)

IV.
¶ 41. There are other issues which cause members of this Court concern, but which do not rise to the level of reversible error in the eyes of a majority of the Court either because they were not properly preserved by an objection or were harmless. We emphasize that the circuit court on remand should view evidence reflecting an accused's silence and inferred affiliations with extreme care.
¶ 42. For the foregoing reasons the judgment of guilt and sentence of death are hereby reversed and this case is remanded to the circuit court for a new trial.
¶ 43. REVERSED AND REMANDED FOR A NEW TRIAL.
PRATHER and SULLIVAN, P.JJ., and PITTMAN, J., concur.
*460 DAN LEE, C.J., and McRAE, J., concur in result only.
MILLS, J., dissents with separate written opinion joined by JAMES L. ROBERTS, Jr. and SMITH, JJ.
MILLS, Justice, dissenting:
¶ 44. I disagree with the majority's conclusion that the evidence that Snelson purchased cocaine after the killing, the testimony regarding other murders previously committed by Snelson, and the alleged discovery violation warrant a reversal in this case. Therefore, I respectfully dissent.

I.
¶ 45. Charles Goode testified that after selling the guns which he and Snelson had stolen during the murder/robbery of Goode's cousin, they stopped at a truck stop on their way back to Jackson because Snelson wanted to buy some cocaine. The majority holds that this evidence was irrelevant and inadmissible under Rule 401, citing Wilson v. State, 661 So.2d 1109 (Miss. 1993) and Collins v. State, 513 So.2d 877 (Miss. 1987).
¶ 46. In Wilson, in which the defendant was charged with sale of cocaine, we reversed where the trial court allowed evidence that the defendant's boyfriend, who was not even involved in the transaction at issue, was charged with a drug offense. 661 So.2d at 1111. In Collins, we held that the introduction of five pornographic magazines found hidden in a desk drawer inside the defendant's shed, which magazines were not used during the commission of the alleged sexual battery, was improper because the magazines were neither relevant to any issues in the case nor a part of the res gestae of the crime. 513 So.2d at 879.
¶ 47. As the majority points out, we noted in Jenkins v. State, 507 So.2d 89, 93 n. 2 (Miss. 1987) that the concept of res gestae "most assuredly has never properly applied to wholly independent bad acts which are obviously unnecessary to the proof of the primary charge." In the case sub judice, however, the evidence showed that on his way home after selling the guns for which he had just murdered Stephen Goode, Snelson used the proceeds from the sale to purchase cocaine. In stark contrast to the cases cited by the majority, it can hardly be said that this evidence was of an act "wholly independent" of the crime charged. Furthermore, although this evidence may have been "unnecessary to the proof of the primary charge," we have never required evidence to be necessary in order for it to be admissible. Rather, it need only be relevant. For instance, prosecutors are not required to put on evidence of motive as an element of the crime charged, but they are certainly free to do so in order to paint for the jury a clearer picture of the crime, which brings us to the particular relevance of the evidence at issue.
¶ 48. Rule 404(b) provides that while not admissible to prove the character of a person to show that he acted in conformity therewith, evidence of other crimes, wrongs or acts is nonetheless admissible for other purposes, including showing motive. The evidence that Snelson, on the night of the murder, purchased cocaine with proceeds from the sale of the guns for which he committed the murder, is directly relevant to his motive for committing the murder. In fact, it was precisely for this reason, combined with the overwhelming evidence of guilt, that we upheld the admission of such evidence in Mack v. State, 650 So.2d 1289, 1313 (Miss. 1994).
¶ 49. The majority attempts to distinguish Mack from the case sub judice by stating that "there is no evidence showing that the primary objective of Snelson's actions was to obtain money to buy cocaine." However, that is exactly what this evidence is. True, it may not be conclusive evidence of Snelson's motive, but it is certainly relevant. Conclusiveness, like necessity, has never been a requirement of admissible evidence. Rather, it is an issue properly to be decided by the jury. The trial court did not err in admitting this evidence.

II.
¶ 50. Before trial, on Snelson's motion in limine to exclude evidence of his statement indicating involvement in other murders, the trial court ruled that it would make a ruling during trial if such testimony was offered and objected to. On direct examination, the *461 prosecutor asked Charles Goode whether, after the murder, he said anything to Snelson "about why he had shot your cousin?" Goode responded, "I told him I couldn't believe he done it," after which the prosecutor stated, "All right." Goode then proceeded to testify that Snelson said, "Don't worry about it. That's my third or fourth ." At this point, the defense objected and moved for a mistrial. The trial court sustained the objection and instructed the jury to disregard the statement, but denied the motion for a mistrial. The majority holds that the trial court erred in failing to declare a mistrial.
¶ 51. The majority points out that we have held many times that where the trial judge sustains an objection to the testimony of a witness and instructs the jury to disregard the testimony, prejudicial error does not result from that testimony. Then the majority states that we have also held on occasion that the trial court abused its discretion in not granting the requested mistrial, citing Barlow v. State, 233 So.2d 829 (Miss. 1970), Henderson v. State, 403 So.2d 139 (Miss. 1981), and Williams v. State, 539 So.2d 1049 (Miss. 1989). Each of these cases, however, is distinguishable from the case sub judice.
¶ 52. In Barlow, we found reversible error where the prosecutor repeatedly asked a prejudicial question after an earlier objection to the same question had been sustained. 233 So.2d at 831. Likewise, in Henderson, we reversed where the "improper conduct [was] compounded by the district attorney after having heard the court's admonishment to the jury on a prior occasion with reference to the same subject matter ..." 403 So.2d at 141. Again, in Williams, we found reversible error where, although the jury was instructed to disregard the prosecutor's comment on a video tape at the first mention thereof, the jury was prejudiced by the prosecutor's "repeated subsequent references to the video tape ..." 539 So.2d at 1052.
¶ 53. In the case sub judice, on the other hand, there is some doubt as to whether the prosecutor even intentionally solicited the objectionable testimony from the witness, whose comment appears from the record to be unresponsive to the prosecutor's question. In fact, the prosecutor affirmatively stated that it was not his intention to solicit this testimony, which determination, like so many others, is properly left to the discretion of the trial judge. However, even assuming arguendo that the prosecutor solicited the testimony, he had not previously been instructed not to, and after the objection was sustained and the jury was instructed to disregard the comment, the prosecutor never again made reference to Snelson's alleged statement. In fact, the majority admits as much in its opinion.
¶ 54. Nevertheless, the majority reasons that the comment on the defendant's involvement in previous murders was so prejudicial as to require a mistrial, citing Kearney v. State, 68 Miss. 233, 8 So. 292 (1890). In Kearney, however, the testimony of a previous killing was admitted into evidence over defense objection, rendering obvious the distinction between Kearney and the case sub judice. In the instant case, the trial court sustained the objection and instructed the jury, both immediately and at the conclusion of the trial, to disregard the testimony. Kearney, therefore, is of little value in this case.
¶ 55. As the majority states, the decision whether to declare a mistrial rests within the sound discretion of the trial judge. In this instance, the trial court sustained the objection and instructed the jury to disregard the comment, and the prosecutor never again made reference to the testimony. In an abundance of caution, the trial judge later offered to poll the jurors to determine whether they could disregard the statement, which offer the defense refused. The trial judge's corrective action was within his discretion and sufficient to cure any error, and thus he did not err in failing to declare a mistrial.

III.
¶ 56. During opening arguments, the prosecutor stated that "you'll hear from the testimony that this Defendant stated, `You know if anyone's there, they're gonna have to be terminated.'" Later, during the State's direct examination of Roy Goode, defense counsel moved in chambers for a mistrial or, alternatively, to exclude any testimony by Charles Goode regarding Snelson's alleged *462 statement. Defense counsel argued that he had been unaware of the alleged statement until it was mentioned in the State's opening argument, and that the State's failure to inform defense counsel of the statement deprived the defense of the opportunity to prepare to meet the evidence. The trial court denied the motion for a mistrial, but granted defense counsel additional time to interview the witness regarding the alleged statement. The majority holds that the trial court erred in failing to declare a mistrial, citing the nowfamiliar Box guidelines for dealing with Rule 4.06 discovery violations. Under the Box guidelines, however, the trial court committed no error.
¶ 57. The Box guidelines require that "[u]pon defense objection, the trial court should give the defendant a reasonable opportunity to become familiar with the undisclosed evidence by interviewing the witness." Cole v. State, 525 So.2d 365, 367 (Miss. 1987) (citing Box v. State, 437 So.2d 19 (Miss. 1983) (Robertson, J., specially concurring)). "If, after this opportunity for familiarization, the defendant believes he may be prejudiced by lack of opportunity to prepare to meet the evidence, he must request a continuance. Failure to do so constitutes a waiver of the issue." Cole, 525 So.2d at 368 (citing Box, supra). Upon defense objection in the case sub judice, the trial court strictly complied with Box by granting defense counsel additional time to interview the witness regarding the undisclosed statement. After having interviewed the witness, however, the defense never again mentioned any objection to the admission of the evidence, nor did it thereafter request a continuance or mistrial. Therefore, under Box, that issue was waived. In any event, Snelson has failed to demonstrate that he was prejudiced by any lack of opportunity to meet the evidence.
¶ 58. The record reflects that defense counsel conducted extensive cross-examination of Charles Goode, during which examination defense counsel twice questioned Goode regarding Snelson's alleged statement and Goode's failure to mention the statement in previous interviews. Defense counsel also made extensive use of Goode's failure to previously mention the statement during closing arguments. There is nothing to indicate that the defense would have been handled any differently had a mistrial been granted. The trial court did not abuse its discretion in failing to declare a mistrial.
¶ 59. Because the trial court committed no error under these three assignments, nor were there any other instances of reversible error, I would affirm Snelson's conviction and death sentence.
JAMES L. ROBERTS, Jr. and SMITH, JJ., join this opinion.