# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2002-DP-00615-SCT

*JAN MICHAEL BRAWNER, JR.*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 4/12/2002 |
| TRIAL JUDGE: | HON. ANDREW C. BAKER |
| COURT FROM WHICH APPEALED: | TATE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | DAVID L. WALKER |
| | TOMMY WAYNE DEFER |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JUDY T. MARTIN |
| | MELANIE K. DOTSON |
| | MARVIN L. WHITE, JR. |
| DISTRICT ATTORNEY: | JOHN W. CHAMPION |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY - DIRECT APPEAL |
| DISPOSITION: | AFFIRMED - 04/29/2004 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**COBB, PRESIDING JUSTICE, FOR THE COURT:**

¶1.    Jan Michael Brawner, Jr. was indicted on four counts of capital murder. Count one was for the willful murder of his three-year-old daughter, Candice Paige Brawner, while engaged in the commission of the crime of felonious abuse and/or battery of the child. Counts two, three, and four were identical: willful murder while engaged in the commission of the crime of robbery of his ex-mother-in-law, Martha Jane Craft; his ex-wife, Barbara

Faye Brawner; and his ex-father-in-law, Carl Albert Craft.

¶2. Brawner was tried before a jury in the Circuit Court of Tate County, Mississippi, and was found guilty on all four counts of capital murder. In a separate sentencing hearing, the jury returned the death penalty on all four counts. Brawner's Motion for Judgment Notwithstanding the Verdict or in the Alternative, for a New Trial was denied, and he then timely appealed to this Court.

## FACTS

¶3. Brawner was 24 years old at the time of the murders. He was raised by his stepfather in Southaven, Mississippi. Brawner finished the ninth grade, but failed an attempt to obtain a GED, and he had worked mostly as a forklift operator in warehouses. In December, 1997, he married Barbara Craft, and in March of 1998, their daughter, Paige, was born. Brawner and Barbara were divorced in March of 2001, and she was awarded custody of Paige. Thereafter, Barbara and Paige lived with Barbara's parents, Carl and Jane Craft, in their home in Tate County. Brawner had also lived with the Crafts off and on during his marriage to Barbara.

¶4. At the time of the murders, Brawner was living with June Fillyaw, whom he met in 2000 through a "date line" on a local radio station. They lived in an apartment in Southaven, and according to Brawner, were having financial difficulties. Brawner had also been told by Barbara that she did not want him around Paige, and he testified that pressure on him was building because nothing was going right.

2

¶5.     On the day before the murders, Brawner left his apartment in Southaven at 3:00 a.m. and headed toward the Craft house, about an hour away. He testified that he thought he might be able to borrow money from Carl Craft, although in his prior statement he said he had planned to rob Carl. Brawner parked the U-haul truck he was driving some distance from the house and walked the rest of the way to the house, where he sat on the front steps from approximately 4:00 a.m. until 7:00 a.m. During this time, he took a 7 mm Ruger rifle out of Carl's truck and emptied the bullets from it, because "he didn't want to get shot." When he heard Carl coming out, he hid behind Carl's truck. A dog started barking, and Carl started looking around for the cause of the dog's barking. When Carl went back inside, Brawner ran away, thinking Carl might be getting a gun. He then drove back to his apartment.

¶6.     The following day, April 25, 2001, Brawner again drove the U-haul to the Craft house, this time around noon. He knocked on the door, but no one was home. He went to the truck to get some rubber gloves that he had purchased earlier in the day, then using the gloves, "took the slats out of the back door," entered the house, and took a .22 rifle. He left the same way he came in, putting the slats back into the door. He then went to Carl's place of work and talked to him, asking if it would be OK for him to go out to the house to wait for Barbara and Paige so that he could see his daughter. Carl said yes.

¶7.     Brawner went back to the Craft house and waited. When Barbara and Paige did not return, he decided to write a note and leave. About that time Barbara, Paige, and Jane Craft

3

pulled into the drive. Jane asked Brawner if he had been to their house the previous day, and he lied, saying "no." Barbara informed him that there was a restraining order against him, and he was not supposed to be there. He said he had a book to give Paige, then went to the truck and retrieved the book. At some point when they had all gone into the house, Jane again asked Brawner if he had been at the house the previous day. At this point Brawner became agitated and went to the truck and brought back the rifle that he had taken from the Craft house earlier that day.

¶8.    When Barbara asked him "what is that," he said it was her dad's gun. He then told Barbara that she was not going to take Paige away from him. At that moment he saw Jane walking toward the bedroom and shot her with the rifle. He said he then saw Barbara coming toward him, and shot her. He then went to where Jane had fallen and "put her out of her misery." After this, he went back to where Barbara had fallen onto the couch and shot her again. Brawner recalled Paige looking up at him and holding up her left arm, which was sprayed with blood, and saying "Daddy you hurt me." Brawner then took her to her bedroom and told her to watch TV, and he went back to the living room and paced. After Brawner determined that Paige would be able to identify him, and in his words, he "was just bent on killing," he went back into the bedroom and shot his daughter twice, killing her. He then waited in the house until Carl came home from work, and when Carl walked through the door, Brawner shot and killed him.

¶9.    Brawner stole approximately $300 from Carl's wallet, stole Jane's wedding ring from

4

her finger, and stole food stamps out of Barbara's purse. He took Windex from the kitchen and attempted to wipe away any fingerprints he may have left. Brawner then returned to his apartment in Southaven, where he gave the stolen wedding ring to June Fillyaw, asked her to marry him, and told her that he bought the ring at a pawn shop. June testified at trial that Brawner was not acting unusual that evening, but he seemed tired.

¶10. David Craft, Barbara Brawner's brother, found the bodies the following morning. He told police that he suspected Brawner and told them where Brawner lived. When they arrested Brawner, they searched the U-haul and June's car and found the .22 rifle and latex gloves. June also told police that Brawner had given her the ring.

¶11. While he was being held in the Tate County jail, Brawner admitted the shootings in a statement made to the Chief Deputy of the Tate County Sheriff's Department, on November 15, 2001, approximately six months after the murders. Brawner completed a jail inmate request form asking to "speak with [chief deputy] Brad Lance whenever possible." Lance gave Brawner *Miranda* warnings, after which Brawner gave a taped statement detailing the events of April 24-25, 2001. Brawner's motion to suppress this statement was denied by the trial court and is not an issue on appeal. Brawner also testified on his own behalf at trial and gave essentially the same account of the events as described above.

¶12. Brawner raised the insanity defense at trial, although he testified that he knew at the time of the shootings that the shootings were wrong. The trial judge found Brawner competent based on information furnished by the Mississippi State Hospital, which certified

5

Brawner competent to stand trial, and mentally responsible for the acts at the time they were committed. Additionally, a court-appointed psychiatrist, chosen by defense counsel, reported that Brawner was neither insane nor incompetent to stand trial.

## DISCUSSION

¶13. Convictions of capital murder and sentences of death, when appealed to this Court, are subject to heightened scrutiny. Under this method of review, all bona fide doubts are to be resolved in favor of the accused because "what may be harmless error in a case with less at stake becomes reversible error when the penalty is death." *Balfour v. State*, 598 So.2d 731, 739 (Miss. 1992). In this case, there are no bona fide doubts. We affirm on all issues.

¶14. Brawner raises eight assignments of error on appeal.

> **I.  WHETHER THE TRIAL COURT ERRED IN DENYING BRAWNER'S MOTION TO SEVER COUNT ONE OF THE INDICTMENT.**

¶15. Brawner filed a motion to sever count one, the willful murder of Candice Paige Brawner while engaged in the commission of the crime of felonious abuse and/or battery of a child. Brawner argues that he did not kill Paige while in the commission of the crime of felonious abuse and/or battery of a child, but simply shot her, killing her, which would constitute simple murder. Brawner argues that counts two, three, and four involve the underlying felony of robbery, which is not found in count one, and thus count one is not based upon the same acts or transactions connected together or constituting parts of a common scheme or plan as required by Miss. Code Ann. § 99-7-2 (Rev. 2000). Brawner

6

also asserts that failure to sever count one violated his right to due process and a fair trial pursuant to the Fifth and Sixth Amendments to the United States Constitution and Article 3, Sections 14 and 26 of the Mississippi Constitution of 1890, but he offers no case law that supports this assertion. Additionally, Brawner concedes that capital murder may be charged in a multi-count indictment per *Woodward v. State*, 533 So. 2d 418, 421-23 (Miss. 1988).

¶16. The State argues that all four murders occurred in the same location and at nearly the same time, and that such murders constitute a common scheme under § 99-7-2. The State also claims that it would be impossible to separate evidence concerning the death of Paige Brawner from the deaths of the others, thus making it impractical to try the cases separately.

¶17. The statute that controls multi-count indictments states:

> (1) Two (2) or more offenses which are triable in the same court may be charged in the same indictment with a separate count for each offense if: (a) the offenses are based on the same act or transaction; or (b) the offenses are based on two (2) or more acts or transactions connected together or constituting parts of a common scheme or plan.
> (2) Where two (2) or more offenses are properly charged in separate counts of a single indictment, all such charges may be tried in a single proceeding.
> . . .

Miss. Code Ann. § 99-7-2 (Rev. 2000). In *Corley v. State*, 584 So.2d 769, 772 (Miss. 1991), this Court identified a procedure by which a multi-count indictment may be challenged:

> When a defendant raises the issue of severance, we recommend that a trial court hold a hearing on the issue. The State, then, has the burden of making a prima facie case showing that the offenses charged fall within the language of the statute allowing multi-count indictments. If the State meets its burden, a defendant may rebut by showing that the offenses were separate and distinct

7

acts or transactions. In making its determination regarding severance, the trial court should pay particular attention to whether the time period between the occurrences is insignificant, whether the evidence proving each count would be admissible to prove each of the other counts, and whether the crimes are interwoven. See *Allman v. State*, 571 So.2d 244, 248 (Miss.1990); *McCarty v. State*, 554 So.2d 909, 914-16 (Miss.1989).

*Corley*, 584 So.2d at 772. Additionally, this Court instructed that if this procedure were followed, the Court would review the trial court's decision under the abuse of discretion standard, giving due deference to the trial court's findings. In *Corley*, the defendant was charged with two counts of attempting to intimidate witnesses. There were two incidents, on the same day, where Corley allegedly almost ran down different men who were to testify against him in an upcoming trial. Although this Court stated that this was a close call, it held that the trial court did not abuse its discretion in denying the motion for severance.

¶18.    In the present case, the trial court held a full hearing on the issue. The killings occurred within a few hours and were all part of the common scheme to rob Carl Craft and eliminate any witnesses. Additionally, the murders are interwoven, and the evidence of each murder would be admissible to prove the other murders since all murders occurred at the same place and closely in time. Brawner did not rebut these arguments but simply stated that the killing of the child was not part of any plan or scheme to rob any of the individuals in the Craft home. However, this statement is at odds with Brawner's trial testimony that he killed the child because she could identify him.

¶19.    In *Stevens v. State*, 806 So.2d 1031 (Miss. 2001), a case similar to the present one, this Court held that four killings which took place in the same home at about the same time,

8

were the result of a common scheme or plan. In *Stevens*, the defendant was indicted on four counts of capital murder and one count of aggravated assault. The defendant was upset with his ex-wife over the custody and support of their daughter and appeared one day at her home with the alleged intent to kill her. The defendant shot and killed his ex-wife, her husband and 11-year-old son, and the son's 12-year-old friend, who were all in the home at the time. The defendant also shot his daughter in the back with a shotgun, although she was able to escape the home through a window and survived. This Court held that all charges were properly included in a multi-count indictment, as the crimes undisputedly constituted a common scheme or plan.

¶20. In *Williams v. State*, 794 So.2d 1019 (Miss. 2001), defendants robbed one woman at gunpoint, then later that evening, robbed and killed another woman, who had no relationship to the first woman. Defendants were charged in a three count indictment with conspiracy, robbery, and capital murder. This Court held that the trial court did not err in trying count two (armed robbery of first woman) and count three (capital murder of second woman) together. "The crimes constituted a common scheme or plan to rob individuals that evening." *Id.* at 1025. Based on these cases, it is clear that in the present case, there was a common scheme or plan to rob at least one of the individuals and kill anyone who might be in the home at the time. Thus, the trial court did not abuse its discretion in denying the motion to sever.

II.    WHETHER THE TRIAL COURT ERRED IN OVERRULING BRAWNER'S OBJECTIONS TO THE STATE'S EXERCISE OF

9

**CERTAIN PEREMPTORY CHALLENGES.**

¶21.    According to ***Batson v. Kentucky***, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and its progeny, parties may not exercise peremptory strikes for unconstitutionally discriminatory reasons.  In this case, the jury was composed of nine women and three men. Nevertheless, Brawner asserted a gender-based objection to the State's peremptory challenges of female jurors during the jury selection process.  Similarly, the State objected to Brawner's use of peremptory strikes against males.  The selection process and peremptory challenges from the record are depicted in the table below:

| Juror # and Sex | State Strike | Defense Strike | Jurors Selected or Reason for Challenge |
|---|---|---|---|
| #7 - female | | D1 | |
| #14 - male | | D2 | Knows David Craft, a family member of deceased victims |
| #32 - male | S1 | | |
| #37 - male | | | Juror #1 |
| #38  - female | S2 | | Juror pregnant.  The previous week a pregnant juror had problems with the lack of air conditioning in the courtroom. |
| #65 - male | | D3 | Crime victim, family members are in law enforcement |
| #68 - female | S3 | | Juror stated "four deaths are enough" |
| #79 - female | | | Juror #2 |
| #81 - female | | | Juror #3 |
| #86 - female | | | Juror #4 |
| #91 - female | | | Juror #5 |
| #105 - male | | D4 | Previously a juror and found a defendant guilty |
| #107 - female | | D5 | Previously a juror and found a defendant guilty |
| #108 - female | S4 | | Juror's brother was convicted of murder |
| #111 - male | | D6 | Crime victim |

| | | | |
|---|---|---|---|
| #112 - female | | | Juror #6 |
| #120 - female | S5 | | Stated she thinks life w/o parole is worse than death |
| #122 - female | S6 | | Information from outside source (local law enforcement) said she would not make a good juror in a death penalty case |
| #123 - male | | | Juror #7 |
| #127 - female | | | Juror #8 |
| #157 - female | | D7 | |
| #169 - female | S7 | | Relative in law enforcement expressed concern as to whether she could consider the death penalty |
| #171 - female | | D8 | |
| #172 - female | | | Juror #9 |
| #176 - female | S8 | | Not employed, stated it would be a hardship for her to sit on the jury |
| #189 - male | S9 | | Son was prosecuted by State |
| #193 - female | S10 | | Preferred the next juror up, also a female |
| #209 - female | | D9 | |
| #211- male | | D10 | |
| #212- male | | D11 | |
| #220 - female | | | Juror #10 |
| #237- not in record | S11 | | |
| #243 - male | | D12 | |
| #254- not in record | S12 | | |
| #261 - male | | | Juror #11 |
| #262 - female | | | Juror #12 |

¶22.   During the initial selection of 12 jurors, the State struck three females and one male,

tendering seven females and five males. Brawner asserted that this was a prima facie showing of gender bias against female jurors and challenged the strikes based on *J.E.B. v. Alabama ex. rel T.B.*, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994). Because seven of the 12 tendered jurors were female, the judge declined to find a prima facie showing of gender bias. Out of caution, however, the judge granted the State's request to show on-the-record the non-discriminatory purpose for each strike (see reasons in table above). The defense then struck four males and two females from the tendered jurors, and the State objected that the defense had struck every white male that had been tendered. The judge then asked the defense to give the reason for each strike and found that even though there seemed to be some bias, it was too weak to find a pattern of gender discrimination.

¶23. The State next tendered one male and five females, striking one male and five females during the process, and the defense renewed its *J.E.B.* gender challenge. The State again, "out of an abundance of caution" requested and was allowed to give reasons for its strikes. The defense offered rebuttal to five of the State's strikes. First, Brawner argued that juror number 38, who is pregnant, had not shown that the baby would be born during the trial or that the pregnancy would impact her ability to be a juror. The State countered that a pregnant juror the previous week had had a hard time with the heat, because the court room was not air conditioned. Next, Brawner argued that jurors 108 and 176 were struck because they were unemployed and that the State was being inconsistent because it allowed other jurors who were retired, thus unemployed, to be seated. The State countered that an

12

additional reason for striking juror 108 was because her brother had been convicted of murder. Finally, the State struck jurors #122 and #169 based on "outside information" provided by law enforcement officials who knew these potential jurors and thought they might be biased against the death penalty. Brawner noted that after juror #122 was questioned under oath by both parties and the judge, she expressed no qualms about the death penalty. Brawner argues that the State's use of "second hand hearsay" evidence restricted his ability to rebut the State's reason for striking such a juror.

¶24. The State offered an additional reason for striking so many females: namely, that there were 13 out of 15 female jurors in a row at one point, thus the State had little choice but to strike female jurors. The judge again found no pattern of gender discrimination.

¶25. The proper analysis to determine if purposeful discrimination in the jury selection process has occurred was set out in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and has been reiterated by this Court in numerous cases. *See Berry v. State*, 728 So.2d 568 (Miss. 1999); *Randall v. State*, 716 So.2d 584 (Miss. 1998); *McFarland v. State*, 707 So.2d 166 (Miss. 1998). *Batson* requires, as step one, that the defendant make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. In step two, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. The *Batson* procedure then authorizes the defendant to rebut the "prosecutorial explanations, if he is able to do so." *Chisolm v. State*, 529 So.2d 635, 638 (Miss. 1988).

13

Finally, in step three, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. The trial judge must "make an on-the-record factual determination that each reason proffered by the State for exercising a peremptory challenge is, in fact, race neutral." *Hatten v. State*, 628 So.2d 294, 295 (Miss. 1993). In other words, the trial judge must determine whether the reason given is a pretext for discrimination. *See Hernandez v. New York*, 500 U.S. 352, 363, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (plurality).

¶26. Although *Batson* and *Hatten* concerned racial discrimination, this Court held in *Bounds v. State*, 688 So.2d 1362 (Miss. 1997), that all of the case law following and interpreting *Batson* also applies to *J.E.B.* and gender discrimination issues, and race-neutral reasons for striking a juror are also permissible gender-neutral reasons. *Id.* As with race-based *Batson* claims, a party alleging gender discrimination must make a prima facie showing of intentional discrimination before the party exercising the challenge is required to explain the basis for the strike. *J.E.B.,* 511 U.S. at 145. When an explanation is required, it need not rise to the level of a "for cause" challenge; rather, it merely must be based on a juror characteristic other than gender, and the proffered explanation may not be pretextual. *See Hernandez*, 500 U.S. at 362-63. The trial court's decision is accorded great deference on review, and this Court will reverse only where the decision is clearly erroneous. *Puckett v. State,* 788 So.2d 752, 756 (Miss. 2000); *Collins v. State*, 691 So.2d 918, 926 (Miss. 1997).

¶27. As explained in *Randall v. State*, 716 So.2d 584, 587 (Miss. 1998), to determine if

a prima facie case of discrimination has been shown, "the pivotal question is whether the opponent of the strike has met the burden of showing that proponent has engaged in a pattern of strikes based on race or gender, or in other words 'the totality of the relevant facts gives rise to an inference of discriminatory purpose.'" *Id.* (quoting **Batson**, 476 U.S. at 94, 106 S.Ct. at 1712). In the present case, the trial judge twice found that the defense did not make a prima facie showing of gender discrimination. In reviewing the trial court's determination, we agree that there was no prima facie showing that the State engaged in a pattern of strikes based on gender. The initial 36 jurors in the jury pool, from which the twelve jurors were ultimately selected, consisted of 22 females and 12 males (the gender of two of the prospective jurors is not clear from the record), or slightly more than 60% female. From these, a jury of nine females and 3 males was selected, or 75% female. Upon the tender of the first twelve prospective jurors, seven female and five male, the State used four strikes to eliminate three women and one man. Upon the second tender of five women and one man, the State struck five women and one man. In total the State tendered 12 women and six men. Although the State struck substantially more women than men, the fact that the selected jury incorporated a proportionally larger percentage of women than were in the venire contradicts the claim of gender discrimination.

¶28.    Notwithstanding the finding that a prima facie showing of gender bias had not been made, the judge nevertheless allowed the State to offer, for the record, its gender-neutral

reasons for striking females.[1]  We view this as a good practice for two reasons.  First, if it becomes necessary to remand for a Batson hearing, this record would be invaluable assistance to the trial judge and would allay the difficulties caused by lost or misplaced documentation and faded memories, which may lessen the credibility of a party.  Second, if on appeal this Court determines that a prima facie case has been made, this procedure gives the Court a complete record for reviewing the issue of pretext.  As revealed in ***Lockett v. State***, 517 So.2d 1346, 1349 (Miss. 1987), this practice has been allowed since a few days after ***Batson*** was decided in 1986.  However, as held in ***Stewart v. State***, 662 So.2d 552, 559 (Miss. 1995), "a trial judge does not have the authority to invoke a ***Batson*** hearing on his own initiative," without the opposing party first making a prima facie showing of discriminatory purpose.

¶29.    In ***Puckett v. State***, 737 So.2d 322, 334-35 (Miss. 1999), this Court stated that the voluntary action of the State in providing race or gender neutral reasons for its strikes without a finding of a prima facie showing of purposeful discrimination does not lessen the burden on the defendant to establish the prima facie case.  "Upon review, this Court 'must first . . . determine[] that the circumstances of the State's use of peremptory challenges against minority venire persons created an inference of purposeful discrimination.'" ***Id.***

---

[1] This procedure differs from that identified in ***Hernandez***, in which the State offered neutral reasons without the trial judge first finding that a prima facie case has been made. ***Hernandez***, 500 U.S. at 359  ("Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot.").

16

(quoting ***Thorson v. State***, 653 So.2d 876, 898 (Miss. 1994)).

¶30. Where a trial judge finds that there is no prima facie showing of discrimination, but then allows the opposite party to make a record for appeal by stating their reasons for the strikes, the trial judge must ensure that the record is complete by allowing a rebuttal and by making specific on-the-record factual findings for each strike as required by ***Hatten***.

¶31. Although in the present case we have held that there was no prima facie showing of discriminatory purpose in the peremptory strikes made by the State, we nevertheless address the issue of using outside information as the basis for striking jurors. We have upheld this practice in previous cases.[2] However, we feel compelled to address the practice of striking potential jurors in criminal trials based on information gathered from outside sources, often law enforcement officers, when those sources are not revealed or are not available for questioning. In addressing the gender-neutral reasons offered by the prosecution for striking female jurors in one case, we stated:

> Clearly, none of these reasons per se violates ***Batson***, and so the analysis moves to step three in order to determine whether, under the totality of the circumstances, the reasons offered by the State were mere pretexts for unlawful discrimination. Here they clearly were not. The determination of pretext, like the other ***Batson*** elements, hinges to a large extent on credibility. ***Purkett***, 514 U.S. at 769, 115 S.Ct. 1769.[3] Furthermore, as this Court stated in ***Mack v. State***, the relative strength of the *prima facie* case will color to a

---

[2] *See* ***Hughes v. State***, 735 So.2d 238 (Miss. 1999) ( "[o]ur information was that [the female juror] is related to a victim in a pending capital murder case here in Itawamba County, and law enforcement feels that at this time because of that she is unstable."). *See also* ***Snow v. State***, 800 So.2d 472, 482 (Miss. 2001); ***Brown v. State***, 749 So.2d 82, 87 (Miss. 1999); ***Lockett***, 517 So.2d at 1352.

[3] ***Purkett v. Elem***, 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (per curiam).

degree the determination of the pretext.  ***Mack v. State***, 650 So.2d 1289, 1298 (Miss. 1994).

***Hughes v. State***, 735 So.2d 238, 252 (Miss. 1999).  In this same light, we listed a number of possible acceptable race-neutral  bases for peremptory strikes in Appendix I of ***Lockett***. Even though ***Lockett*** was decided prior to our ***Hatten*** requirement for on-the-record factual determinations, we stated that "our opinion should **not be construed** to limit legitimate, racially neutral reasons to the reasons in this case or **to hold these reasons to be automatically race-neutral in any other case**." ***Lockett***, 517 So.2d at 1352 (emphasis added).  While we do not hold today that our trial judges should conduct a "mini-hearing" within a ***Batson*** hearing each time a peremptory challenge is exercised based on information gained from outside sources, we do depend on the trial courts to exercise caution to ensure that peremptory challenges based on information from outside sources is credible and supported by on-the-record factual findings to this effect and that a complete record is made on this issue.  If in doubt about the validity of outside information, the trial court should do what is necessary to ensure the proposed reasons are non-pretextual.  This may include questioning the outside source on the record.

¶32.   We find no error in the trial court's ***J.E.B.*** analysis.  No prima facie case of gender discrimination was shown by Brawner.  It is not necessary to review each gender neutral reason offered by the State for its strikes.

   III.   **WHETHER THE TRIAL COURT ERRED IN DENYING BRAWNER'S ORE TENUS MOTION TO ABOLISH THE USE OF PEREMPTORY CHALLENGES IN CRIMINAL CASES.**

18

¶33.   During the selection of the jury, Brawner raised this motion ore tenus asking the trial

court to abolish the use of peremptory challenges in criminal cases.  The trial court denied

the motion.  This issue was raised in ***Snow v. State***, 800 So.2d 472, 483 (Miss. 2001), where

Snow asserted that the racial and gender restrictions on peremptory challenges are not

enforceable under the three-step analysis provided by ***Batson***, and, therefore, that the

appropriate remedy is the abolition of peremptory challenges.  This Court stated:

> No court, this Court included, has held the allowance of peremptory
> challenges to be unconstitutional despite the argument made by Justice
> Marshall in ***Batson*** to that end and we decline to take that opportunity here,
> where the issue is presented for the first time on appeal.  See ***Batson***, 476 U.S.
> at 104, 106 S.Ct. 1712 (Marshall, J., concurring)(writing that peremptory
> challenges should be eliminated in order to end racial discrimination in the
> jury-selection process because ***Batson*** could not do so alone).

***Snow***, 800 So.2d at 483-84.[4]  Unlike Snow, Brawner brought up this issue during trial and

in his post trial motions.  Brawner argues that Justice Sullivan of this Court also supported

restrictions on peremptory challenges, advocating their complete elimination in his

concurring opinion in ***Thorson v. State***, 653 So.2d 876, 896-97 (Miss. 1994).  Additionally,

Brawner argues that a prosecutor may easily assert a purported race-neutral or gender-neutral

reason for striking a potential juror, but it is difficult for the trial judge to determine if the

reason given is in good faith.

---

[4] In his concurring opinion in ***Batson***, Justice Marshall strongly advocated abolishing
peremptory challenges in criminal cases, saying "the inherent potential of peremptory challenges
to distort the jury process by permitting the exclusion of jurors on racial grounds should ideally lead
the Court to ban them entirely from the criminal justice system." ***Batson***, 476 U.S. at 107, 106 S.Ct.
at 1728, 90 L.Ed.2d at 94.

¶34. The U.S. Supreme Court has stated that the right of peremptory challenge is not a constitutional guarantee. *Batson*, 476 U.S. at 108, 106 S.Ct. at 1729, 90 L.Ed.2d at 95 (citing *Frazier v. United States*, 335 U.S. 497, 69 S.Ct. 201, 93 L.Ed. 187 (1948)). However, notwithstanding Justice Marshall's concurring opinion, the *Batson* majority upheld the use of peremptory challenges. Additionally, in *J.E.B.* the Court maintained this position stating "[o]ur conclusion that litigants may not strike potential jurors solely on the basis of gender does not imply the elimination of all peremptory challenges." *J.E.B.*, 511 U.S. at 143, 114 S.Ct. at 1429. Brawner concedes that in the almost 20 years since *Batson* was decided no court, including this Court, has adopted Justice Marshall's position. Additionally, Brawner has not cited any authority that would persuade this Court that the abolition of peremptory challenges would necessarily secure a more fair or impartial jury for a defendant, and the potential exists that it would have the opposite effect. As Chief Justice Hawkins stated in his specially concurring opinion in *Hatten v. State*, 628 So.2d 294 (Miss. 1993), "[a] structure centuries in the building should hardly be radically altered, much less demolished, without painstaking study." *Id.* at 305. Therefore, we decline to make such a sweeping change.

IV.    **WHETHER THE TRIAL COURT ERRED IN DENYING BRAWNER'S MOTION IN LIMINE TO EXCLUDE OR IN THE ALTERNATIVE TO LIMIT THE INTRODUCTION OF PHOTOGRAPHIC EVIDENCE VIA SLIDE PROJECTOR.**

V.    **WHETHER THE TRIAL COURT ERRED IN DENYING BRAWNER'S MOTION IN LIMINE TO EXCLUDE OR IN THE ALTERNATIVE LIMIT THE INTRODUCTION OF**

**PHOTOGRAPHIC EVIDENCE.**

¶35. Because these issues are intertwined, we will analyze them together. Brawner filed a Motion in Limine to Exclude or in the Alternative to Limit Introduction of Photographic Evidence. He also filed a similar motion regarding introduction of photographic evidence via a slide projector. Brawner argued that, since there was no dispute as to what or who the photos depicted, where the photos were taken or the manner of death, admitting them or enlarging them using a slide projector would be irrelevant and inflammatory. The trial court granted the motion to limit photographic evidence, requiring the State to seek the court's ruling on the photographs to be introduced, but subsequently allowed each of the State's photographs to be admitted. The trial court denied the motion to restrict the use of a slide projector, stating that use of a projector is a modern day practice that has been used in the courtroom for at least a quarter of a century to display evidence. The court also noted that attempting to limit the size of the displayed image had in the past produced blurry and useless photos.

¶36. The denial of a motion in limine is reviewed for an abuse of discretion. *McDowell v. State*, 807 So.2d 413, 421 (Miss. 2001). A motion in limine should be granted only when the trial court finds two factors are present: (1) the material or evidence in question will be inadmissible at a trial under the rules of evidence; and (2) the mere offer, reference, or statements made during trial concerning the material will tend to prejudice the jury. *McGilberry v. State*, 797 So.2d 940, 942 (Miss. 2001).

21

¶37. In support of his argument against admitting the photographs, Brawner cites *Sudduth v. State*, 562 So.2d 67 (Miss. 1990), in which this Court noted that "photographs of the victim should not ordinarily be admitted into evidence where the killing is not contradicted or denied, and the corpus delicti and the identity of the deceased have been established." *Id.* at 70. We also stated that "photographs of bodies may nevertheless be admitted into evidence in criminal cases where they have probative value and where they are not so gruesome or used in such a way as to be overly prejudicial or inflammatory." *Id. See Brown v. State*, 690 So.2d 276, 289 (Miss. 1996); *Alexander v. State*, 610 So.2d 320, 338 (Miss. 1992). Also, the admissibility of photographs rests within the sound discretion of the trial court. *Jackson v. State*, 672 So.2d 468, 485 (Miss. 1996); *Griffin v. State*, 557 So.2d 542, 549 (Miss. 1990). Moreover, the decision of the trial judge will be upheld unless there has been an abuse of discretion. This standard is very difficult to meet. In fact, the "discretion of the trial judge runs toward almost unlimited admissibility regardless of the gruesomeness, repetitiveness, and the extenuation of probative value." *Brown*, 690 So.2d at 289; *Holly v. State*, 671 So.2d 32, 41 (Miss. 1996).

¶38. The photos in question depict: the body of Carl Craft (exhibit 3); the body of Jane Craft (exhibit 12); and the body of Paige Brawner (exhibit 15). Each of these pictures shows the bodies as they were found by police, and there was only one picture of each of the victims submitted. Brawner argues that there were other, less gruesome and inflammatory photographs, that could have been used instead of these, to which the State counters that

22

there were other, more gruesome, photographs that were not introduced. The State also claims that as long as the court determines that a photograph is admissible, it is the State's choice as to which photographs are used, not the choice of the defendant.

¶39.    As stated in *Sudduth*, 562 So.2d at 70, photographs of bodies may be admitted where they have probative value and where they are not so gruesome or used in such a way as to be overly prejudicial or inflammatory. In this case, the photographs have substantial probative value. They identify the victims and show them as they were found at the scene of the murders. They help corroborate the State's assertion of the cause of death. More importantly, they help the jury to determine the credibility of Brawner's statements to police and his testimony on the witness stand. The use of the slide projector helped the jury to follow the testimony of the crime scene examiner as to the positions of the bodies and related physical evidence.

¶40.    This Court has frequently upheld the admission of photos depicting bloody gunshot wounds. *See, e.g., Walker v. State*, 740 So. 2d 873, 880-88 (Miss. 1999); *Miller v. State*, 740 So. 2d 858, 864-65 (Miss. 1999); *Manning v. State*, 735 So.2d 323, 342 (Miss. 1999) (affirming admission of "bloody," "close-up" photos of one victim's body face down in pool of blood and knife wound to another's throat); *Jordan v. State*, 728 So.2d 1088, 1093 (Miss. 1998); *Williams v. State*, 684 So. 2d, 1179, 1198 (Miss. 1996) (affirming admission of photos of victim's excised larynx, heart, vaginal and anal area, as well as photos of stab wound to victim's chest and heart); *Jackson v. State*, 684 So. 2d 1213, 1230 (Miss. 1996)

23

(affirming admission of photos of four dead children stabbed in neck, chest, and face).

¶41.    In *Woodward v. State*, 726 So.2d 524, 537 (Miss. 1997), we stated that "the use of a projector to enhance the testimony of a witness is within the discretion of the trial court, and is encouraged--to the extent it 'aids the jury in understanding the witness or other evidence.'"  *Id.* (quoting *Jenkins v. State*, 607 So.2d 1171, 1176 (Miss. 1992)).   We qualified this by saying the manner of use may not be for the purpose of inflaming the jury. In *Woodward*, a photo of the deceased as she was found by police, was admitted over the defendant's objection, as evidence supporting a "heinous, atrocious, or cruel" aggravating factor. This photo was left showing on the projector after the authenticating witness finished testifying, and while the jurors exited the courtroom, and the defendant moved for a mistrial based on the State's attempt to inflame the jury.  This Court found that the trial court did not abuse its discretion in denying the defendant's motion for a mistrial.

¶42.    Here, the photographs in question were shown on a screen between 24 and 30 feet from the jury, and they were enlarged to approximately 40" x 60".  The photos were those of the crime scene as found by police.  The record shows that the photos were displayed for approximately 30 seconds each.  There is no evidence in the record that the jury was inflamed from this presentation of the photos. Neither does Brawner cite a case supporting his assertion that the mere presentation of photographs in this manner is inflammatory.  In summary, these photographs have probative value in accurately depicting the scene of a gruesome crime.  They are not unduly prejudicial, and the trial court did not abuse its

24

discretion by admitting them into evidence or allowing them to be displayed using a slide projector.

> **VI.   WHETHER THE TRIAL COURT ERRED IN DENYING BRAWNER'S MOTION TO QUASH THE CAPITAL MURDER COMPONENT OF COUNT ONE OF THE INDICTMENT.**
>
> **VII.   WHETHER THE TRIAL COURT ERRED IN GRANTING INSTRUCTION C-16.**

¶43.   Both of these questions deal with the same issue, so will be analyzed together. Brawner filed a motion to quash the capital murder component of count one of the indictment, challenging the underlying felony of child abuse. Additionally, Brawner objected to sentencing instruction C-16, charging the aggravator of felony child abuse, arguing that there was no evidentiary basis for felonious child abuse and/or battery of a child. Brawner argues that the autopsy report prepared by Dr. Steven Hayne noted that Paige had two gunshot wounds and that each gunshot would have been fatal independent of the other. He asserts that since there was no underlying child abuse causing death, the charge should be simple murder. The State relies on *Faraga v. State*, 514 So.2d 295 (Miss. 1987), and *Stevens v. State*, 806 So.2d 1031 (Miss. 2001), to contend that under Mississippi law, the intentional act of murdering a child by any manner or form constitutes capital murder.

¶44.   The Mississippi statute governing when a killing shall be capital murder states in pertinent part:

> (2) The killing of a human being without the authority of law by any means or in any manner shall be capital murder in the following cases:
> . . .

25

(f) When done with or without any design to effect death, by any person engaged in the commission of the crime of felonious abuse and/or battery of a child in violation of subsection (2) of Section 97-5-39, or in any attempt to commit such felony;

. . .

Miss. Code. Ann. § 97-3-19(2)(f) (Rev. 2000). Subsection 2 of Section 97-5-39 reads as follows:

(2) Any person who shall intentionally (a) burn any child, (b) torture any child or, (c) except in self-defense or in order to prevent bodily harm to a third party, whip, **strike or otherwise abuse or mutilate any child in such a manner as to cause serious bodily harm**, shall be guilty of felonious abuse and/or battery of a child and, upon conviction, may be punished by imprisonment in the penitentiary for not more than twenty (20) years.

Miss. Code. Ann. § 97-5-39 (Rev. 2000) (emphasis added). In *Faraga*, the defendant was indicted for capital murder in the killing of a two month-old-child. Faraga took the child and threw him onto the hood of a car, then twice threw the child to the pavement. The child died of head wounds received during this episode. Faraga argued that the statutes were passed by the Legislature to deter persistent child abuse, and in his case there was a single act and no pattern of abuse. This Court dismissed this argument stating that "Faraga's act of throwing a child to the pavement which resulted in skull fractures and broken bones clearly was intended to be classified as felonious abuse of a child under Miss. Code Ann. § 97-5-39(2)." 514 So.2d at 302. The Court also said "[t]he intent of the Legislature was that serious child abusers would be guilty of capital murder if the child died" and clarified that the abuse need not be dispensed over a period of time. Thus, if conduct fits the description of felonious child abuse, and the child subsequently dies, it is capital murder. *Id.* at 302. In

26

*Stevens*, the facts are not as evident as in *Faraga* that felonious child abuse occurred.  As discussed previously, the Stevens shot everyone in his ex-wife's home when he came to kill his ex-wife.  We found that it was the "intent of the Mississippi Legislature under Miss. Code Ann. § 97-5-39(2) that the intentional act of murdering a child by any manner or form constitutes felonious child abuse and, therefore, constitutes capital murder under Miss. Code Ann. § 97-3-19(2)."[5] 806 So.2d at 1044.  Here, Brawner shot his daughter's grandmother as his daughter watched, then shot his daughter's mother as she watched.  He again shot both the grandmother and the mother two additional times, all as Paige looked on.  He then shot his daughter twice.  Shooting Paige fits the description of felony child abuse in that it is a strike to the child in a manner as to cause serious bodily harm.  Therefore, we reject Brawner's assertion that the killing of Paige Brawner was not capital murder.

### VIII. WHETHER THE SENTENCE OF DEATH IMPOSED BY THE JURY IN COUNTS 1, 2, 3 & 4 OF THE INDICTMENT IS EXCESSIVE OR DISPROPORTIONATE TO THE SAME PENALTY IMPOSED IN SIMILAR CASES.

¶45.    Brawner asserts that Miss. Code Ann. § 99-19-105(3) (Rev. 2000) requires the Court to perform a proportionality review if it affirms a death sentence in a capital case.  He also requests the Court to reverse the death sentence for Count one based on his arguments in Issues VI and VII.  Brawner cites no authority to support his contention that the death

---

[5] Taken to the extreme, the felonious child abuse statute might incorrectly be applied to the act of a person who purposefully kills a 17-year-old minor, as in a gang fight or a barroom brawl. However, our holdings in *Stevens* and in the present case do not extend the statute this far. *Faraga*, *Stevens*, and this case all involve small children.  We urge the Legislature to clarify the intent of § 97-5-39(2).

27

penalty is disproportionate in this case.

¶46.    This Court must review the death sentence in accordance with Miss. Code Ann. §

99-19-105(3), which states:

> (3) With regard to the sentence, the court shall determine:
> (a) Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor;
> (b) Whether the evidence supports the jury's or the judge's finding of a statutory aggravating circumstance as enumerated in Section 99-19-101;
> (c) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant; and
> (d) Should one or more of the aggravating circumstances be found invalid on appeal, the Mississippi Supreme Court shall determine whether the remaining aggravating circumstances are outweighed by the mitigating circumstances or whether the inclusion of any invalid circumstance was harmless error or both.

Miss. Code Ann. § 99-19-105(3).

¶47.    There is nothing in the record to suggest that the sentence of death was imposed under

the influence of passion, prejudice or any other arbitrary factor.  In addition, Brawner has

not argued to the contrary.  There is evidence supporting the finding of aggravating factors.

The following aggravating factors were found by the jury, and we find there is sufficient

evidence supporting them:  the capital offense was committed by a person under sentence

of imprisonment (four counts); the offense was committed while the defendant was engaged

in the commission of robbery (three of the four counts); and the offense was committed for

the purpose of avoiding or preventing lawful arrest (four counts).

¶48.    The death penalty has been held not to be disproportionate in cases similar to this one.

See **Stevens v. State**, 806 So.2d 1031 (Miss. 1999) (defendant shot and killed his ex-wife,

28

also shot and killed two children and the ex-wife's husband who were in the home at the time, and shot his teenage daughter, who was not killed); *McGilberry v. State*, 741 So.2d 894 (Miss. 1999) (16-year-old defendant robbed and killed four members of his own family); *Brown v. State*, 690 So.2d 276 (Miss. 1996) (defendant chopped to death three members of a family); *Jackson v. State*, 684 So.2d 1213 (Miss. 1996) (defendant stabbed and killed four children during attempted robbery of his mother's home).

¶49.    There are other cases, where fewer persons, and no children, were killed, which have sustained this test:  *Manning v. State,* 765 So.2d 516 (Miss. 2000) (defendant murdered two elderly women by means of beating them unconscious with iron and slashing their throats with kitchen knife, while robbing them of approximately $12); *Brown v. State*, 682 So.2d 340 (Miss. 1996) (defendant who shot store clerk four times during commission of armed robbery).  *See also* *Doss v. State*, 709 So.2d 369 (Miss. 1997) (death sentence was proportionate where defendant robbed and shot victim); *Cabello v. State*, 471 So.2d 332, 350 (Miss. 1985) (death sentence was proportionate where defendant strangled and robbed victim); *Evans v. State*, 422 So.2d 737, 739 (Miss. 1982) (death sentence was proportionate where defendant robbed and shot victim).

¶50.    In view of these and other cases (see Appendix), we cannot say that the death penalty is disproportionate in the current case where Brawner killed his ex-wife, mother-in-law and father-in-law during the commission of a robbery, then shot and killed his own three-year-old daughter because she could identify him.

29

## CONCLUSION

¶51.    For these reasons, we affirm the trial court's judgment.

¶52.    **COUNTS I THROUGH IV: CONVICTIONS OF CAPITAL MURDER AND SENTENCES OF DEATH BY CONTINUOUS INTRAVENOUS ADMINISTRATION OF A LETHAL QUANTITY OF AN ULTRA SHORT-ACTING BARBITURATE OR OTHER SIMILAR DRUG IN COMBINATION WITH A CHEMICAL PARALYTIC AGENT, AFFIRMED.**

**SMITH, C.J., WALLER, P.J., EASLEY, CARLSON AND DICKINSON, JJ., CONCUR.  GRAVES, J., CONCURS IN RESULT.  DIAZ AND RANDOLPH, JJ., NOT PARTICIPATING.**

# APPENDIX

## DEATH CASES AFFIRMED BY THIS COURT

*Byrom v. State,* --- So.2d --- (Miss. 2004).

*Howell v. State,* 860 So.2d 704 (Miss. 2003).

*Howard v. State,* 853 So.2d 781 (Miss. 2003).

*Walker v. State,* 815 So.2d 1209 (Miss. 2002). *following remand.

*Bishop v. State,* 812 So.2d 934 (Miss. 2002).

*Stevens v. State,* 806 So.2d 1031 (Miss. 2002).

*Grayson v. State,* 806 So.2d 241 (Miss. 2002).

*Knox v. State,* 805 So.2d 527 (Miss. 2002).

*Simmons v. State,* 805 So.2d 452 (Miss. 2002).

*Berry v. State,* 802 So.2d 1033 (Miss. 2001).

*Snow v. State*, 800 So.2d 472 (Miss. 2001).

*Mitchell v. State,* 792 So.2d 192 (Miss. 2001).

*Puckett v. State,* 788 So.2d 752 (Miss. 2001). * following remand.

*Goodin v. State,* 787 So.2d 639 (Miss. 2001).

*Jordan v. State,* 786 So.2d 987 (Miss. 2001).

*Manning v. State,* 765 So.2d 516 (Miss. 2000). *following remand.

*Eskridge v. State,* 765 So.2d 508 (Miss. 2000).

*McGilberry v. State,* 741 So. 2d 894 (Miss. 1999)*.*

*Puckett v. State,* 737 So. 2d 322 (Miss. 1999).   *remanded for *Batson* hearing.

*Manning v. State,* 735 So. 2d 323 (Miss. 1999). *remanded for *Batson* hearing.

*Hughes v. State,* 735 So. 2d 238 (Miss. 1999).

*Turner v. State,* 732 So. 2d 937 (Miss. 1999).

*Smith v. State,* 729 So. 2d 1191 (Miss. 1998).

*Burns v. State,* 729 So. 2d 203 (Miss. 1998).

# DEATH CASES AFFIRMED BY THIS COURT

## (continued)

*Jordan v. State,* 728 So. 2d 1088 (Miss. 1998).

*Gray v. State,* 728 So. 2d 36 (Miss. 1998).

*Manning v. State,* 726 So. 2d 1152 (Miss. 1998).

*Woodward v. State,* 726 So. 2d 524 (Miss. 1997).

*Bell v. State,* 725 So. 2d 836 (Miss. 1998).

*Evans v. State,* 725 So. 2d 613 (Miss. 1997).

*Brewer v. State,* 725 So. 2d 106 (Miss. 1998).

*Crawford v. State,* 716 So. 2d 1028 (Miss. 1998).

*Doss v. State,* 709 So. 2d 369 (Miss. 1996).

*Underwood v. State,* 708 So. 2d 18 (Miss. 1998).

*Holland v. State,* 705 So. 2d 307 (Miss. 1997).

*Wells v. State,* 698 So. 2d 497 (Miss. 1997).

*Wilcher v. State,* 697 So. 2d 1087 (Miss. 1997).

*Wiley v. State,* 691 So. 2d 959 (Miss. 1997).

*Brown v. State*, 690 So. 2d 276 (Miss. 1996).

*Simon v. State*, 688 So. 2d 791 (Miss.1997).

*Jackson v. State*, 684 So. 2d 1213 (Miss. 1996).

*Williams v. State,* 684 So. 2d 1179 (Miss. 1996).

*Davis v. State,* 684 So. 2d 643 (Miss. 1996).

*Taylor v. State*, 682 So. 2d. 359 (Miss. 1996).

*Brown v. State*, 682 So. 2d 340 (Miss. 1996).

*Blue v. State*, 674 So. 2d 1184 (Miss. 1996).

*Holly v. State*, 671 So. 2d 32 (Miss. 1996).

*Walker v. State*, 671 So. 2d 581(Miss. 1995).

*Russell v. State*, 670 So. 2d 816 (Miss. 1995).

# DEATH CASES AFFIRMED BY THIS COURT

## (continued)

*Ballenger v. State*, 667 So. 2d 1242 (Miss. 1995).

*Davis v. State*, 660 So. 2d 1228 (Miss. 1995).

*Carr v. State*, 655 So. 2d 824 (Miss. 1995).

*Mack v. State*, 650 So. 2d 1289 (Miss. 1994).

*Chase v. State*, 645 So. 2d 829 (Miss. 1994).

*Foster v. State*, 639 So. 2d 1263 (Miss. 1994).

*Conner v. State*, 632 So. 2d 1239 (Miss. 1993).

*Hansen v. State*, 592 So. 2d 114 (Miss. 1991).

*\*Shell v. State*, 554 So. 2d 887 (Miss. 1989), *Shell v. Mississippi,* 498 U.S. 1 (1990) reversing, in part, and remanding, *Shell v. State*, 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*Davis v. State*, 551 So. 2d  165 (Miss. 1989).

*Minnick v. State*, 551 So. 2d 77 (Miss. 1989).

*\*Pinkney v. State*, 538 So. 2d 329 (Miss. 1989), *Pinkney v. Mississippi*, 494 U.S. 1075 (1990) vacating and remanding *Pinkney v. State*, 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

*\*Clemons v. State*, 535 So. 2d 1354 (Miss. 1988), *Clemons v. Mississippi*, 494 U.S. 738 (1990) vacating and remanding, *Clemons v. State*, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*Woodward v. State*, 533 So. 2d 418 (Miss. 1988).

*Nixon v. State*, 533 So. 2d 1078 (Miss. 1987).

*Cole v. State*, 525 So. 2d 365 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1346 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1317 (Miss. 1987).

*Faraga v. State*, 514 So. 2d 295 (Miss. 1987).

 *\*Jones v. State*, 517 So. 2d 1295 (Miss. 1987)*, Jones v. Mississippi*, 487 U.S. 1230 (1988) vacating and remanding, *Jones v. State*, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Wiley v. State*, 484 So. 2d 339 (Miss. 1986).

*Johnson v. State*, 477 So. 2d 196 (Miss. 1985).

*Gray v. State*, 472 So. 2d 409 (Miss. 1985).

*Cabello v. State*, 471 So. 2d 332 (Miss. 1985).

*Jordan v. State*, 464 So. 2d 475 (Miss. 1985).

*Wilcher v. State*, 455 So. 2d 727 (Miss. 1984).

*Billiot v. State*, 454 So. 2d 445 (Miss. 1984).

*Stringer v. State*, 454 So. 2d 468 (Miss. 1984).

*Dufour v. State*, 453 So. 2d 337 (Miss. 1984).

*Neal v. State*, 451 So. 2d 743 (Miss. 1984).

*Booker v. State*, 449 So. 2d 209 (Miss. 1984).

*Wilcher v. State*, 448 So. 2d 927 (Miss. 1984).

*Caldwell v. State*, 443 So. 2d 806 (Miss. 1983).

*Irving v. State*, 441 So. 2d 846 (Miss. 1983).

*Tokman v. State*, 435 So. 2d 664 (Miss. 1983).

*Leatherwood v. State*, 435 So. 2d 645 (Miss. 1983).

*Hill v. State*, 432 So. 2d 427 (Miss. 1983).

*Pruett v. State*, 431 So. 2d 1101 (Miss. 1983).

*Gilliard v. State*, 428 So. 2d 576 (Miss. 1983).

*Evans v. State*, 422 So. 2d 737 (Miss. 1982).

# DEATH CASES AFFIRMED BY THIS COURT

## (continued)

*King v. State*, 421 So. 2d 1009 (Miss. 1982).

*Wheat v. State*, 420 So. 2d 229 (Miss. 1982).

*Smith v. State*, 419 So. 2d 563 (Miss. 1982).

*Johnson v. State*, 416 So. 2d 383 (Miss.1982).

*Edwards v. State*, 413 So. 2d 1007 (Miss. 1982).

*Bullock v. State*, 391 So. 2d 601 (Miss. 1980).

*Reddix v. State*, 381 So. 2d 999 (Miss. 1980).

*Jones v. State*, 381 So. 2d 983 (Miss. 1980).

*Culberson v. State*, 379 So. 2d 499 (Miss. 1979).

*Gray v. State*, 375 So. 2d 994 (Miss. 1979).

*Jordan v. State*, 365 So. 2d 1198 (Miss. 1978).

*Voyles v. State*, 362 So. 2d 1236 (Miss. 1978).

*Irving v. State*, 361 So. 2d 1360 (Miss. 1978).

*Washington v. State*, 361 So. 2d 6l (Miss. 1978).

*Bell v. State*, 360 So. 2d 1206 (Miss. 1978).

   * Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.

## DEATH CASES REVERSED AS TO GUILT PHASE
## AND SENTENCE PHASE

*Flowers v. State,* 842 So.2d 531 (Miss. 2003).

*Randall v. State,* 806 So. 2d 185 (Miss. 2002).

*Flowers v. State,* 773 So.2d 309 (Miss. 2000).

*Edwards v. State,* 737 So. 2d 275 (Miss. 1999).

*Smith v. State,* 733 So. 2d 793 (Miss. 1999).

*Porter v. State,* 732 So.2d 899 (Miss. 1999).

*Kolberg v. State,* 704 So. 2d 1307 (Miss. 1997).

*Snelson v. State,* 704 So. 2d 452 (Miss. 1997).

*Fusilier v. State,* 702 So. 2d 388 (Miss. 1997).

*Howard v. State,* 701 So. 2d 274 (Miss. 1997).

*Lester v. State,* 692 So. 2d 755 (Miss. 1997).

*Hunter v. State*, 684 So. 2d 625 (Miss. 1996).

*Lanier v. State*, 684 So. 2d 93 (Miss. 1996).

*Giles v. State,* 650 So. 2d 846 (Miss. 1995).

*Duplantis v. State*, 644 So. 2d 1235 (Miss. 1994).

*Harrison v. State*, 635 So. 2d 894 (Miss. 1994).

*Butler v. State*, 608 So. 2d 314 (Miss. 1992).

*Jenkins v. State*, 607 So. 2d 1171 (Miss. 1992).

*Abram v. State*, 606 So. 2d 1015 (Miss. 1992).

*Balfour v. State*, 598 So. 2d 731 (Miss. 1992).

*Griffin v. State*, 557 So. 2d 542 (Miss. 1990).

*Bevill v. State*, 556 So. 2d 699 (Miss. 1990).

*West v. State*, 553 So. 2d 8 (Miss. 1989).

*Leatherwood v. State*, 548 So. 2d 389 (Miss. 1989).

*Mease v. State*, 539 So. 2d 1324 (Miss. 1989).

## DEATH CASES REVERSED AS TO GUILT PHASE
## AND SENTENCE PHASE
### (continued)

*Houston v. State*,  531 So. 2d 598 (Miss. 1988).

*West v. State*, 519 So. 2d 418 (Miss. 1988).

*Davis v. State*, 512 So. 2d 129l (Miss. 1987).

*Williamson v. State*, 512 So. 2d 868 (Miss. 1987).

*Foster v. State*, 508 So. 2d 1111 (Miss. 1987).

*Smith v. State*, 499 So. 2d 750 (Miss. 1986).

*West v. State*, 485 So. 2d 681 (Miss. 1985).

*Fisher v. State*, 481 So. 2d 203 (Miss. 1985).

*Johnson v. State*, 476 So. 2d 1195 (Miss. 1985).

*Fuselier v. State*, 468 So. 2d 45 (Miss. 1985).

*West v. State*, 463 So. 2d 1048 (Miss. 1985).

*Jones v. State*, 461 So. 2d 686 (Miss. 1984).

*Moffett v. State*, 456 So. 2d 714 (Miss. 1984).

*Lanier v. State*, 450 So. 2d 69 (Miss. 1984).

*Laney v. State*, 421 So. 2d 1216 (Miss. 1982).

# DEATH CASES REVERSED
## AS TO PUNISHMENT AND REMANDED
## FOR RESENTENCING TO LIFE IMPRISONMENT

*Reddix v. State*, 547 So. 2d 792 (Miss. 1989).

*Wheeler v. State*, 536 So. 2d 1341 (Miss. 1988).

*White v. State*, 532 So. 2d 1207 (Miss. 1988).

*Bullock v. State*, 525 So. 2d 764 (Miss. 1987).

*Edwards v. State*, 441 So. 2d 84 (Miss. l983).

*Dycus v. State*, 440 So. 2d 246 (Miss. 1983).

*Coleman v. State*, 378 So. 2d 640 (Miss. 1979).

# DEATH CASES REVERSED AS TO
## PUNISHMENT AND REMANDED FOR A NEW TRIAL
## <u>ON SENTENCING PHASE ONLY</u>

*King v. State,* 784 So.2d 884 (Miss. 2001).

*Walker v. State,* 740 So.2d 873 (Miss. 1999).

*Watts v. State,* 733 So.2d 214 (Miss. 1999).

*West v. State,* 725 So. 2d 872 (Miss. 1998).

*Smith v. State*, 724 So. 2d 280 (Miss. 1998).

*Berry v. State,* 703 So. 2d 269 (Miss. 1997).

*Booker v. State*, 699 So. 2d 132 (Miss. 1997).

*Taylor v. State*, 672 So. 2d 1246 (Miss. 1996).

*\*Shell v. State*, 554 So. 2d 887 (Miss. 1989), *Shell v. Mississippi*, 498 U.S. 1 (1990) reversing, in part, and remanding, *Shell v. State* 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*\*Pinkney v. State*, 538 So. 2d 329 (Miss. 1989), *Pinkney v. Mississippi,* 494 U.S. 1075 (1990) vacating and remanding, *Pinkney v. State***,** 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

*\*Clemons v. State*, 535 So. 2d 1354 (Miss. 1988), *Clemons v. Mississippi*, 494 U.S. 738 (1990) vacating and remanding, *Clemons v. State*, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*\*Jones v. State*, 517 So. 2d 1295 (Miss. 1987), *Jones v. Mississippi***,** 487 U.S. 1230 (1988) vacating and remanding, *Jones v. State*, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Russell v. State*, 607 So. 2d 1107 (Miss. 1992).

*Holland v. State*, 587 So. 2d 848 (Miss. 1991).

*Willie v. State*, 585 So. 2d 660 (Miss. 1991).

*Ladner v. State*, 584 So. 2d 743 (Miss. 1991).

*Mackbee v. State*, 575 So. 2d 16 (Miss. 1990).

*Berry v. State*, 575 So. 2d 1 (Miss. 1990).

*Turner v. State*, 573 So. 2d 657 (Miss. 1990).

*State v. Tokman*, 564 So. 2d 1339 (Miss. 1990).

*Johnson v. State*, 547 So. 2d 59 (Miss. 1989).

*Williams v. State*, 544 So. 2d 782 (Miss. 1989); *sentence aff'd* 684 So. 2d 1179 (1996).

*Lanier v. State*, 533 So. 2d 473 (Miss. 1988).

*Stringer v. State*, 500 So. 2d 928 (Miss. 1986).

*Pinkton v. State*, 481 So. 2d 306 (Miss. 1985).

*Mhoon v. State*, 464 So. 2d 77 (Miss. 1985).

*Cannaday v. State*, 455 So. 2d 713 (Miss. 1984).

*Wiley v. State*, 449 So. 2d 756 (Miss. 1984); resentencing affirmed, *Wiley v. State*, 484 So. 2d 339 (Miss. 1986), *cert. denied **Wiley v. Mississippi**, 479 U.S. 1036 (1988); resentencing ordered, *Wiley v. State,* 635 So. 2d 802 (Miss. 1993) following writ of habeas corpus issued pursuant to *Wiley v. Puckett*, 969 So. 2d 86, 105-106 (5th Cir. 1992); resentencing affirmed, *Wiley v. State*, 95-DP-00149, February 13, 1997 (rehearing pending).

*Williams v. State*, 445 So. 2d 798 (Miss. 1984). * Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.